655 A.2d 521

ESTATE of Walter C. PEW, Deceased (Three Cases).

Appeal of Wendy Pew BANKOFF, Statutory Heir of Walter C. Pew, Deceased and Beneficiary of the Trust for the Benefit of Walter C. Pew Under the Deed of Trust of Mary C. Pew, Appellant.

Appeal of Arlene Pew GUSSMAN, Statutory Heir of Walter C. Pew, Deceased and Beneficiary of the Trust for the Benefit of Walter C. Pew Under the Deed of Trust of Mary C. Pew, Appellant.

Trust Estate Mary C. Pew, Settlor Sur Trust
for Walter C. Pew (Four Cases).

Appeal of Arlene Pew GUSSMAN, Beneficiary of the Trust
for the Benefit of Walter C. Pew, Under the Deed of
Trust of Mary C. Pew, Appellant (Two Cases).

Appeal of Wendy Pew BANKOFF, Beneficiary of the Trust
for the Benefit of Walter C. Pew, Under the Deed of
Trust of Mary C. Pew, Appellant.

Appeal of Arlene Pew GUSSMAN, Beneficiary of the Trust for
the Benefit of Walter C. Pew, Under the Deed of Trust of Mary
C. Pew, Dated June 2, 1932, and Statutory Heir of Walter C.
Pew, Deceased, Appellant.

Superior Court of Pennsylvania.

Argued Oct. 27, 1993.

Filed Dec. 28, 1994.

198

200

Marvin Comisky and Thomas A. Sprague, Philadelphia, for Wendy Pew Bankoff.

James R. Ledwith, Philadelphia, for Glenmede Trust, participating party.

John R. Suria, Philadelphia, for Bryn Mawr Hosp. Foundation, Massachusetts Institute of Technology & University of California. San Francisco Foundation, participating parties.

J. Brooke Aker, Norristown, for Co–Executors of Estate of Walter C. Pew & Co–Trustees of the 1986 Walter C. Pew Trust, participating parties.

Before ROWLEY, P.J., and McEWEN, and KELLY, JJ.

KELLY, Judge.

In these consolidated appeals, we are called to determine whether the trial court properly upheld the distribution of ordinary and extraordinary stock dividends to a life beneficiary between 1948 and 1963 pursuant to the Pennsylvania Rule of Apportionment in a trust created in 1932 or whether the

trustees were compelled by the terms of the 1945 and 1947 Principal and Income Acts to distribute all stock dividends received after the date of the passages of these Acts to the trust principal for the benefit of the remaindermen. We are also called upon to determine whether the trustees are subject to surcharge for failing to dispose of the common stocks that the settlor initially used to fund the trust principal and diversify the trust investments in a manner that would equally benefit the life beneficiary and the remaindermen. We are further asked to determine whether the co-successor trustees are liable for a surcharge for failing to sell these same stocks during a period when the market price of the stocks declined. Additionally, we are asked to determine whether the trial court properly dismissed the appellants' objections regarding the disqualification of opposing counsel due to various alleged conflicts of interest. Finally, we are requested to determine whether the trial court properly barred as untimely the appellants' objections to distributions to be made pursuant to a 1986 agreement of trust which, while incorporated by reference in a probated will, was not offered for probate together with the will. We affirm the trial court's decree in part, reverse in part and direct the admission to probate of the 1986 agreement of trust.

The relevant facts and procedural history of these consolidated appeals are as follows. On June 2, 1932, the settlor, Mary C. Pew, the wife of the founder of Sun Oil Company, Joseph N. Pew, created an *inter vivos* trust for the benefit of her two grandsons, Arthur E. Pew, Jr. and Walter C. Pew using identical language and making identical provisions for each grandson and the remainder of the trust. The trust principal was funded with 40,000 shares of the common stock of the Sun Oil Company. Under the terms of the trust, 20,000 shares of Sun Oil Company common stock were to be set aside for each grandson, with the net income from each grandson's 20,000 share portion of the trust to be paid to that grandson for life. Upon each grandson's death, the settlor instructed that the net income from the deceased grandson's portion of the trust be paid "in equal shares for the support, mainte-

nance and education" of his children until each child reaches the age of twenty-four. After reaching age twenty-four, the settlor instructed that each child is to be given twenty percent of their respective share of the trust principal, "per stirpes," absolutely. The settlor further instructed that at age twenty-eight, each child was to be paid thirty percent of his or her share of the trust principal. Finally, the settlor instructed that upon reaching the age of thirty-two, each child was to received the remaining fifty percent balance of his or her respective share of the trust principal, per stirpes, absolutely.

The trust deed also contained a proviso that should either Arthur E. Pew or Walter C. Pew die childless, the remainder interests in the childless brother's share of the trust should go to the other brother's children. The trust deed named J. Howard Pew, J.N. Pew, Jr. and Mary Ethel Pew as trustees and empowered them with absolute discretionary power either to retain or sell the shares of Sun Oil Company stock, forming the trust principal. The "intact value" of each twenty thousand share portion of the trust principal on the date the trust's creation was $816,140.00.

When the trust was created in 1932, there was no statutory law addressing the issue of the distribution of stock dividends. The trust, itself, contained no explicit instructions regarding whether stock dividends should be paid over to the income beneficiaries, Arthur E. Pew and Walter C. Pew, or made part of the trust principal to be paid over to the remaindermen at the death of the income beneficiaries. Therefore, the trustees followed the long standing Pennsylvania Rule of Apportionment as set out in *Earp's Appeal,* 28 Pa. 368 (1857), that the life tenant was entitled to all stock dividends except where necessary to preserve the intact value of the trust principal, in which case the stock dividends were to be apportioned between the life tenant and the principal. This rule had been reaffirmed by our Supreme Court on May 26, 1932, seven days before the creation of the Mary C. Pew Trust in *In re Waterhouse's Estate,* 308 Pa. 422, 428, 162 A. 295, 296 (1932).

On December 1, 1947, the trustees filed the First Account for the Mary C. Pew Trust, Sur Trust for Arthur E. Pew, Jr.

and Walter C. Pew. The time period included in the trustees' First Account ran from the date of the trust's creation, June 2, 1932 to October, 1947. The First Account was filed to determine whether the Principal and Income Act of 1945 which was repealed and substantially re-enacted as the Principal and Income Act of 1947 should be retroactively applied to a trust that had been created thirteen years before the adoption of this statute by the legislature.

The Principal and Income Acts of 1945 and 1947 abrogated the Pennsylvania Rule of Apportionment and adopted the Massachusetts Rule which held that "all dividends on shares of a corporation forming a part of the principal which are payable in the shares of the corporation shall be deemed principal." The trustees took the position that the Principal and Income Acts of 1945 and 1947 did not apply retroactively and that to apply these acts to trusts created before their passage would be unconstitutional. The trustees proposed that distributions of the stock dividends continue to be made in accordance with the Pennsylvania Rule of Apportionment which was in effect at the time the trust was created. A guardian *ad litem* and trustee *ad litem*, Lloyd H. Wood, Esquire was appointed to represent the interests of the unborn, unascertained persons. Mr. Wood filed objections to the trustees' First Account challenging the trustees' practice of distributing all of the stock dividends to the life tenants and income beneficiaries, Arthur E. Pew, Jr. and Walter C. Pew.

In his initial adjudication of December 15, 1948, President Judge Holland held that while the Principal and Income Acts of 1945 and 1947 could not be applied retroactively to stock dividends paid to the income beneficiaries by the trustees from 1932 to the date of the passage of the Acts, the Acts could be applied to the stock dividends received after the date of their passage and such stock dividends should be paid over to the trust principal in compliance with the Acts. *Pew Estate*, 65 Montg.Co.L.R. 94, 98 (1948). In his initial adjudication, President Judge Holland also suggested that the trustees seriously consider dividing the trust into two separate trusts, one for Arthur E. Pew, Jr. and one for Walter C. Pew. *Id.* at 97.

Upon consideration of the trustees' exceptions to his initial adjudication, President Judge Holland issued a final decree on February 18, 1949 which held that the provisions of the Principal and Income Acts of 1945 and 1947 were unconstitutional when applied retroactively to trusts created before their enactments. Thus, President Judge Holland followed the holding set out in *Crawford's Estate*, 96 P.L.J. 377 (1948) and held that Arthur E. Pew, Jr. and Walter C. Pew had a vested interest in stock dividends as of the time of the trust's creation and were entitled to receive all stock dividends which would not impair the intact value of the trust principal. President Judge Holland's final decree was affirmed by our Supreme Court in *Pew Trust*, 362 Pa. 468, 67 A.2d 129 (1949) in which the Supreme Court followed its holding in *Crawford's Estate*, 362 Pa. 458, 67 A.2d 124 (1949) that the Principal and Income Act of 1945 may be applied constitutionally only to trusts created after its effective date regarding distribution of stock dividends; however, the rule of apportionment must be applied to all trusts created before the passage of that Act. These two cases were overruled twelve years later by our Supreme Court in *In re Catherwood Trust*, 405 Pa. 61, 173 A.2d 86 (1961).

Upon the confirmation of the First Account, the trustees followed the suggestion contained in President Judge Holland's opinion and separated the trust into two individual trusts. These two trusts have been denoted as the Arthur Trust and the Walter Trust. J. Howard Pew, Mary Ethel Pew and J.N. Pew, Jr. remained as trustees for both trusts. After the division of the trust into two trusts, the trustees religiously followed the law set forth in the Supreme Court's decision in *Crawford's Estate, supra* 362 Pa. 458, 67 A.2d 124 and *Pew Trust, supra* 362 Pa. 468, 67 A.2d 129 by paying the various stock dividends over to Arthur E. Pew, Jr. and Walter C. Pew as income in accordance with the rule of apportionment, including those in excess of six percent which were disbursed to the income beneficiaries from 1949 through 1953.

In 1954, the directors of Sun Oil Company approved a resolution which declared a five for four stock split. Upon

receipt of these additional 6,359.75 shares of common stock for each trust on December 30, 1954, the trustees placed the additional shares into the principal of each trust. The trustees then filed a Second Account of their administration of the Arthur Trust, but did not file a similar account regarding the Walter Trust. Arthur E. Pew, Jr. filed an objection to the Second Account of the Arthur Trust asserting that the trustees failed to apportion the additional shares received from the stock split to income. The appellants' interests were represented in this proceeding by M. Paul Smith, Esquire, guardian *ad litem* and trustee *ad litem*.[1] Mr. Smith filed objections to the Second Account of the Arthur Trust regarding the trustee's policy of making loans to Arthur E. Pew, Jr. from the trust principal.

Pursuant to a stipulation dated June 9, 1958, the parties approved of the trustees' continuing policy of paying the stock dividends to the life tenant unless the stock dividends were needed to preserve the trust principal. Therefore, the issues before the auditing court were whether the additional shares of stock received by the trustees as a result of the stock split should be apportioned between the income beneficiary, Arthur E. Pew, Jr. and the trust principal or be exclusively made part of the trust principal for the benefit of the remaindermen and whether the trustees were permitted to make loans of $210,-645.71 and two thousand shares of Sun Oil Company common stock to Arthur E. Pew, Jr. The distinguished trial judge, the Honorable Alfred L. Taxis, entered a *decree nisi* which dismissed Arthur E. Pew, Jr.'s objection to the Second Account of the Arthur Trust and sustained the guardian and trustee *ad litem's* objections. Arthur E. Pew, Jr.'s exceptions to the *decree nisi* were dismissed by a final decree entered on July 2, 1958. Our Supreme Court in *Pew Trust*, 398 Pa. 523, 530, 158 A.2d 552, 556 (1960) affirmed Judge Taxis' final decree holding that the additional shares received from the stock split were properly included in the trust principal "as a stock split

---

1. We note appellant, Arlene Carol Pew Gussman, was a named party in this case, while appellant's, Wendy Pew Bankoff's, interests were represented by M. Paul Smith in his capacity as trustee *ad litem*.

represents neither a division of corporate earnings or profits nor a recognized apportionable event and, therefore, is not apportionable." [2]

In 1961, our Supreme Court's seminal decision, *In re Catherwood Trust*, 405 Pa. 61, 173 A.2d 86 (1961), explicitly overruled its previous decisions in *Crawford's Estate, supra* 362 Pa. 458, 67 A.2d 124; *Pew Estate, supra* 362 Pa. 468, 67 A.2d 129; and *Warden's Trust*, 382 Pa. 311, 115 A.2d 159 (1955), *overruled*, 405 Pa. 61, 77, 173 A.2d 86, 94 (1961) and deemed the retroactive application of the Principal and Income Act constitutional. The Supreme Court further stated that in overruling the *Crawford, Pew,* and *Warden* decisions it was keenly aware of the fact that distributions have been made in many estates in reliance upon these cases and the vitality of the Pennsylvania Rule of Apportionment. Therefore, such distributions are not affected by the *Catherwood* decision. *In re Catherwood's Trust, supra* 405 Pa. at 77, 173 A.2d at 93. Thus, the Supreme Court directed that its holding abolishing the Pennsylvania Rule of Apportionment was to be applied prospectively. *Id.* at 78, 173 A.2d at 94.

Shortly after the *Catherwood* decision, on December 8, 1961, the trustees received from Sun Oil Company a stock dividend of six percent on the shares held by each trust. Due to the confusion created by the *Catherwood* decision, the trustees filed a Third Account of the Arthur Trust proposing the six percent stock dividend be distributed to the income beneficiary, Arthur E. Pew, Jr. M. Paul Smith, Esquire, in his capacity as guardian and trustee *ad litem* for the remaindermen of the trust, including the appellants who were named parties, filed objections contending that the six percent stock dividend should remain part of the trust principal. Judge Taxis agreed with the guardian and trustee *ad litem's* position and directed the trustees to include the six percent stock

2. After the objections raised by the guardian and trustee *ad litem* to the $210,645.71 and two thousand shares of Sun Oil Company stock loans made by the trustees to Arthur E. Pew, Jr. were sustained by the trial court, the trustees were directed to collect and return to the trust principal the cash and stock shares loaned to Arthur E. Pew, Jr. who did not challenge the trial court's ruling regarding the repayment of loans in his appeal to the Supreme Court.

dividend in principal. *See Pew Trust No. 2*, 12 Pa.Fiduc. 275 (1962). This decision was reversed by the Supreme Court in *In re Trust Estate of Pew*, 411 Pa. 96, 191 A.2d 399 (1963).

In this case, the Supreme Court, placing itself in the "armchair" of the settlor, Mary C. Pew, and considering not only the language and scheme of the trust deed but also the facts and circumstances with which she was surrounded including the laws in effect at the time of the trust's creation, held it was her intent that the income beneficiary, Arthur E. Pew, Jr., should receive the small stock dividends of six percent or less as well as the cash dividends. *Id.* at 109–10, 191 A.2d at 406. The Supreme Court further held that in all trusts created before the effective date of the Principal and Income Act of 1945, a gift of "income" or "net income" includes small stock dividends of six percent or less, unless the testator or settlor clearly expressed a contrary intent. *Id.* at 109, 191 A.2d at 406. This decision was subsequently codified by the General Assembly in 20 Pa.C.S.A. § 8105(a).

On July 8, 1963, as a result of the Supreme Court's decision concerning the Arthur Trust, the trustees paid to Walter C. Pew the 1961 six percent stock dividend and the 1962 five percent stock dividend that they had made part of the trust principal in accordance with Judge Taxis' decision in *Pew Trust No. 2, supra* 12 Pa.Fiduc. 275. On December 11, 1964, Walter C. Pew executed an approval of account, receipt and release agreement in lieu of a court audit of the Second Account of the Walter Trust. In this agreement, Walter C. Pew released the trustees from any liability in connection with the Walter Trust or its administration from February 18, 1949 to September 11, 1964.

In the years following the codification of our Supreme Court's 1963 decision in *Pew Trust, supra* 398 Pa. 523, 158 A.2d 552 the trustees paid all stock dividends of six percent or less over to income beneficiaries, Arthur E. Pew, Jr. and Walter C. Pew, while retaining the shares of stocks gained from all stock splits and stock dividends in excess of six percent in the trust principal. This practice continued after the death of Arthur E. Pew, Jr. and the end of the Arthur

Trust. During the ensuing years, the original trustees named in the 1932 trust deed, J.N. Pew, Jr., J. Howard Pew and Mary Ethel Pew died [3] and were replaced as trustees by the Glenmede Trust Company and Ann Pew Curran, the daughter of Walter C. Pew.

On April 9, 1986, Walter C. Pew executed an agreement of trust in which he set up individual trusts for his two living daughters, Ann Pew Curran and Marim Pew Hamilton. In this agreement of trust, Walter C. Pew also made provisions for his various grandchildren by outrightly distributing twenty-five thousand shares of the Sun Company [4] to each of his grandchildren who had attained the age of thirty-five except John Holton, III and setting up individual grandchild trusts comprised of twenty-five thousand shares each for grandchild under the age of thirty-five and John Holton, III. *See* April 9, 1986 agreement of trust, Item 2, (b) 5 & 6. The April 9, 1986 agreement of trust specifically excluded the appellants, Arlene Pew Gussman and Wendy Pew Bankoff, the daughters of Walter C. Pew's deceased son, Walter C. Pew, Jr. and their descendants from participation in the grandchildrens' trusts.

On December 12, 1988, Walter C. Pew executed a will which stated that the specific bequests of the testator were contained in the April 9, 1986 agreement of trust. The appellants were not mentioned as beneficiaries in the will. On March 14, 1989, Walter C. Pew died. At that time, his income from the 1932 trust of Mary C. Pew, Sur Trust for Walter C. Pew ceased and the remainder interests became payable.

Six days after his death, Walter C. Pew's December 12, 1988 will was offered for probate. The 1986 agreement of trust was not offered for probate in conjunction with the will at this time. Pursuant to the terms of the will, R. Anderson Pew, Robert C. Dunlop, Howard Guess and Core States Bank were

3. J.N. Pew, Jr. died on April 9, 1963 and the Glenmede Trust Company was appointed successor co-trustee by decree of J. Taxis. J. Howard Pew died on November 24, 1971 and Mary Ethel Pew died on June 24, 1979. Glenmede Trust Company continued as sole trustee until June 10, 1982 when it, pursuant to paragraph 7 of the trust deed, appointed Ann Pew Curran, as successor co-trustee.

4. On April 27, 1976, Sun Oil Company changed its name to the Sun Company.

granted letters testamentary. No caveats to this will were filed by either appellant within the one year time period time allotted by 20 Pa.C.S.A. § 908.

The executors of Walter C. Pew's estate then filed the First and Partial Account of his estate, covering their estate administration from March 14, 1989 to October 31, 1991. The appellants filed separate objections to the First and Partial Account of the estate alleging (1) the executors improperly included the Mary C. Pew Trust, Sur Trust for Walter C. Pew's assets among the estate's assets; (2) the decedent lacked capacity at the time of his execution of the 1986 agreement of trust or undue influence was exerted upon him in the creation of this document; (3) the law firm of Pepper, Hamilton & Scheetz's dual representation of both the executors' of Walter C. Pew's estate and the Glenmede Trust Company, corporate co-trustee of the Mary C. Pew Trust, Sur Trust for Walter C. Pew, was a conflict of interest; and (4) the trustees of the Mary C. Pew Trust, Sur Trust for Walter C. Pew's failure to diversify the Trust's portfolio investment constituted a breach of their fiduciary duty.

During this same time frame, the co-successor trustees of the Mary C. Pew Trust, Sur Trust for Walter C. Pew, presented their Third and Final Account of the trust administration covering the period from December 30, 1964 to December 31, 1989. The Third and Final Account stated the value of the principal balance on hand at $7,503,114.86, including 86,000 shares of Oryx Energy Company (Oryx) common stock valued at $3,816,250.00 [5] and 86,000 shares of Sun Company common stock valued at $3,515.250.00. The auditing judge, the Honorable Alfred L. Taxis, was presented with several questions for adjudication. The first question concerned the claims of Grace Fleming–Payne, who asserted that Walter C. Pew was her biological father. Thus, she was entitled to a remainder-

---

5. On November 2, 1988, the trustee received from Sun Co. Inc. in a one for one split, 86,000 shares of Sun Exploration and Production Company common stock. These shares of Sun Exploration and Production Company common stock were included in the trust principal. On March 3, 1989, Sun Exploration and Production Company changed its name to Oryx Energy Company.

man's share of the Mary C. Pew Trust, Sur Trust for Walter C. Pew. Ms. Fleming–Payne's paternity claim was dismissed by Judge Taxis. The decree dismissing the paternity claim was affirmed by this Court in *Estate of Pew,* 409 Pa.Super. 417, 598 A.2d 65 (1991), *alloc. denied,* 530 Pa. 645, 607 A.2d 255 (1992).

After the disposal of the paternity claims of Ms. Fleming–Payne, Judge Taxis turned his attention to the second question which was whether the remainder interests in the trust principal should be divided into two shares between Walter C. Pew's surviving daughters, Ann Pew Curran and Marim Pew Hamilton or whether the trust principal should be divided into four shares encompassing both Walter C. Pew's surviving children and the estates of his two sons, the appellants' father, Walter C. Pew, Jr. and Elliot Pew, who predeceased their father. Judge Taxis held that the remainder interests in the trust principal should be divided into four shares, one for each of Walter C. Pew's four children. Judge Taxis also held that the three surviving children of Walter C. Pew, Jr. and the three surviving children of Elliot Pew were each entitled to a one-third share of their respective deceased parent's share of the trust principal or one-twelfth of the trust principal. *See* Memorandum Opinion and *Decree Nisi* dated September 9, 1992. Thus, the distribution scheme of the remainder interests of the Mary C. Pew Trust, Sur Trust for Walter C. Pew can be seen by the following Mary C. Pew Trust family tree diagram:

**MARY C. PEW TRUST FAMILY TREE**

MARY C. PEW

(grandsons) Arthur Pew · Walter C. Pew
 (deceased) (D. 3/14/89)

Ann Pew Marim Pew Elliot Pew Walter C. Pew, Jr.
Curran Hamilton (deceased) (deceased)

Jane Margaret Elliott Pew, Jr. William Bateman
Pew Stenzel Hill Pew

Walter C. Pew, III Arlene Pew Wendy Pew
 Gussman Bankoff

---

Because the appellants were held to be interested parties through their one-twelfth remainder interests in the Mary C. Pew Trust, Sur Trust for Walter C. Pew, Judge Taxis permitted them to proceed with their objections to the co-successor trustees, the Glenmede Trust Company and Ann Pew Curran, Third and Final Account. In these objections, the appellants asserted that the trustees of the Second Account and the co-successor trustees of the Third Account improperly distributed stock dividends to Walter C. Pew as income. The appellants maintained that between the years 1948 and 1963, all stock dividends paid to the Walter Trust should have been allocated by the trustees of the Second Account to the trust principal.

The appellants further claimed in their objections that the trustees to the Second Account and their co-successor trustees in the Third Account breached their fiduciary duty by failing to develop an investment portfolio which properly balanced

the income interests of the life tenant against the growth interests of the remaindermen. Therefore, the appellants claimed that the trustees of the Second Account and the co-successor trustees of the Third Account should be surcharged for their breach of fiduciary duty and directed to proceed against the personal representatives of the Estate of Walter C. Pew in order to recoup the windfall received by Walter C. Pew during his lifetime and the losses sustained by the trust remaindermen.

Finally, the appellants contended that the co-successor trustees of the Third Account had a fiduciary duty to compel the trustees of the Second Account to file a formal account in order to terminate their administration of the trust, thus allowing the remaindermen an opportunity to raise their objections to the trust administration at the time when the books, records, documents and witnesses, would have been readily available for examination. Accordingly, the appellants asserted that the co-successor trustees of the Third Account should be surcharged to the extent that their failure to require a formal accounting before taking over the reins of the administration of the trust injured the remaindermen.

On October 29, 1992, the co-successor trustees of the Mary C. Pew Trust, Sur Trust for Walter C. Pew, filed a supplement to the Third and Final Account. The supplement to the Third and Final Account covered the period from December 31, 1989 to August 31, 1992. This supplemental account valued the trust principal balance at $4,362,117.54, including 86,000 shares of Oryx common stock valued at $2,074,750.00 and 86,000 shares of Sun common stock valued at $2,203,750.00. The appellants filed objections to the supplement to the Third and Final Account which incorporated all of the objections raised to the Third and Final Account and further alleged that co-successor trustee, the Glenmede Trust Company sold large blocks of Oryx and Sun Company common stock on behalf of other trusts, funds, estates and accounts that it managed and advised certain of its favored clients to sell their Oryx and Sun Company common stock while failing to sell the Oryx and Sun Company common stock held by the Mary C. Pew Trust

before the value of these stocks declined. Thus, the appellants demanded that the co-successor trustees be surcharged in excess of $3,053,000.00 to cover the diminution of the value of the stock which occurred during the time period covered by the supplement to the Third and Final Account plus interests and costs, including reasonable attorney fees.

In its answer, co-successor trustee, the Glenmede Trust Company denied that it breached its fiduciary duties to the remaindermen. The Glenmede Trust Company further denied that it advised certain of its favored clients and customers to sell Oryx stocks, but rather that Oryx approached the Glenmede Trust in September, 1990, offering to repurchase its share of common stock held by the Pew charitable trusts. The private trusts, such as the Mary C. Pew Trust, Sur Trust for Walter C. Pew, were not included in this offer. The Glenmede Trust Company further stated that at the time Oryx's offer was made, H. Marim Pew Hamilton and Ann Pew Curran were the only undisputed remaindermen to the Mary C. Pew Trust, Sur Trust for Walter C. Pew, and as such, had been informed of the Oryx repurchase transaction and were also informed that the Mary C. Pew Trust, Sur Trust for Walter C. Pew, was not part of the transaction. The Glenmede Trust Company further stated in its answer that, after the trial court's decision of September 9, 1992 that the appellants together with their brother, Walter C. Pew, III, and the three children of Elliott Pew had remainder interests in the trust, it contacted all six of the settlor's great-grandchildren, each of whom directed it not to sell the Oryx and Sun Company common stock. The Glenmede Trust Company further asserted that it was not until after appellant, Wendy Pew Bankoff, filed her objections to the supplement to the Third and Final Account that she directed it to sell the the Trust's common stock in Oryx and the Sun Company.

In conjunction with her objections to the supplement to the Third and Final Account, appellant, Wendy Pew Bankoff, also petitioned the trial court to be permitted to conduct discovery in the form of interrogatories, requests for the production of documents, depositions and subpoenas upon the following per-

sons and entities: Ann Pew Curran, The Glenmede Trust Company, the Sun Company and Oryx. Appellant, Arlene Pew Gussman, joined her sister's petition.

On February 16, 1993, oral argument on the appellant's objections to the Third and Final Account of the Mary C. Pew Trust, Sur Trust for Walter C. Pew, the supplement to the Third and Final Account of the Mary C. Pew Trust, Sur Trust for Walter C. Pew, and the First and Partial Account of the Estate of Walter C. Pew was held. On March 24, 1993, oral argument was held on appellant Wendy Pew Bankoff's petition for allowance of discovery.

On March 29, 1993, the trial court entered a final decree dismissing all of the objections filed by the appellants to the co-successor trustees' Third and Final Account and supplement to the Third and Final Account of the Mary C. Pew Trust, Sur Trust for Walter C. Pew. The trial court also dismissed all of the objections filed by the appellants to the First and Partial Account of the Estate of Walter C. Pew. Finally, the trial court dismissed with prejudice the appellants' petition for allowance of discovery. These timely appeals by the appellants followed.

On appeal, the appellants raise the following issues for our review:

(1) Did the trustees, between the years 1948 and 1963, in contravention of the Principal and Income Acts of 1945 and 1947, improperly characterize all stock dividends received as income rather than principal and therefore incorrectly distribute these stock dividends to the life tenant, Walter C. Pew, instead of making these stock dividends part of the trust principal?

(2) Did the trial court err by refusing to direct the trustees to seek recovery from the Estate of Walter C. Pew for the stock dividends that were allegedly improperly paid over to him by the trustees between the years 1948 and 1963?

(3) Did the trial court commit error by refusing to surcharge the trustees for allegedly improperly distributing the

stock dividends received between 1948 and 1963 to Walter C. Pew?

(4) Did the trial court err by dismissing the appellants' claims for refunds from the Estate of Walter C. Pew for the present value of the stock dividends which were allegedly improperly distributed to him during his lifetime?

(5) Did the trial court err by failing to find that the trustees and co-successor trustees breached their fiduciary duty by failing to properly balance the income interests of the life beneficiary against the growth interest of the remaindermen during the lifetime of the income beneficiary?

(6) Did the trial court err by summarily dismissing the appellants' claims that the co-successor trustees breached their fiduciary duty and/or had a conflict of interest in connection with their failure to sell certain corporate stock during the period covered by the supplement to the Third and Final Account of the Mary C. Pew Trust, Sur Trust for Walter C. Pew and refusing the appellants' discovery requests for information pertaining to the Glenmede Trust company's administration of other trusts which included Sun Company and Oryx common stock in their investment portfolio during the time period covered by the supplement to the Third Account?

(7) Did the trial court commit error when it failed to disqualify counsel for the executors of the Estate of Walter C. Pew and the co-trustees of the April 9, 1986 trust due to a conflict of interest?

(8) Did the trial court erroneously dismiss, without evidentiary hearing, the appellants' objections to the first and partial account of the Estate of Walter C. Pew that the April 9, 1986 trust is a invalid beneficiary of his estate because the decedent either lacked the requisite capacity to execute the trust or was unduly influenced to do so?

In their first four issues on appeal, the appellants contend that the trustees incorrectly designated all stock dividends received between 1948 and September, 1963 as income, rather than principal, and improperly distributed those stock divi-

dends to the income beneficiary, Walter C. Pew. The appellants argue that as the Principal and Income Act of 1947 required that all stock dividends received shall be deemed principal, all stock dividends received between 1948 and 1963 should have been placed by the trustees into the trust principal for the benefit of the remaindermen. The appellants assert that the trial court erroneously utilized the doctrine of collateral estoppel to apply all adjudications of the various accountings of the Arthur Trust to the Walter Trust which was not a party to those adjudications. The appellants maintain, relying on our Supreme Court's decision in *Estate of Flinn,* 479 Pa. 312, 388 A.2d 672 (1978), that the doctrine of collateral estoppel does not operate to impose determinations made in the adjudication of the administration of one fund created under a trust deed upon the adjudication of the administration of another fund created under the same trust deed. Thus, the appellants claim that all adjudications made regarding the various accountings of the Arthur Trust between 1948 and 1963 are inapplicable to the Walter Trust. Therefore, the appellants remonstrate that the Supreme Court's decision in *Estate of Tyler,* 474 Pa. 148, 377 A.2d 157 (1977) which specifically overruled the first holding in *Pew Trust, supra* 362 Pa. 468, 67 A.2d 129, and held that after 1945, absent contrary direction from the settlor, all ordinary and extraordinary stock dividends received between 1948 and 1963 must be allocated to principal, should be applied with full vigor to the Walter Trust. Accordingly, the appellants declare that all stock dividends received between 1948 and 1963 which they purport were wrongfully paid over to Walter C. Pew by the trustees must be returned to the trust principal. Thus, the appellants maintain that either the co-successor trustees be surcharged for these stock dividends which were improperly paid to Walter C. Pew or that the improperly paid stock dividends be returned to the trust principal by the estate of Walter C. Pew. Alternatively, the appellants assert that in the event this Court should hold that the trustees properly paid the ordinary stock dividends of six percent or less to Walter C. Pew, the estate of Walter C. Pew must still be required to return the present value of the extraordinary

stock dividends which were improperly paid to Walter C. Pew through the years 1949 to 1953 to the trust principal.

The provisions of the Principal and Income Act of 1947 pertinent to our consideration of these appeals are Sections 2, 3(1), and 5(1).

Section 2. Application of the Act; Powers of Settlor.

—This act shall govern the ascertainment of income and principal and the apportionment of receipts and expenses between tenants and remaindermen in all cases where a principal has been established with, or, unless otherwise stated hereinafter, without the interposition of a trust: Provided, That the person establishing the principal may himself direct the manner of ascertainment of income and principal and the apportionment of receipts and expenses or grant discretion to the trustee, or other person, to do so and such provision and direction, where not otherwise contrary to law, shall control, notwithstanding this act.

Section 3. Income and Principal; Disposition.—

(1) All receipts of money or other property, paid or delivered as rent of realty, or hire of personalty, or dividends on corporate shares, payable other than in shares of the corporation itself of the same kind and rank as the shares on which such dividend is paid, or interest on money loaned, or interest on or the rental or use value of property wrongfully withheld or tortiously damaged, or otherwise in return for the use of principal, shall be deemed income, unless otherwise expressly provided in this act.

Section 5. Corporate Dividends and Share Rights.—

(1) All dividends on shares of a corporation, forming a part of the principal, which are payable in the shares of the corporation itself of the same kind and rank as the shares on which such dividend is paid shall be deemed principal. Subject to the provisions of this section all dividends payable otherwise than in such shares of the corporation itself, including ordinary and extraordinary dividends and dividends payable in shares or other securities or obligations of corporations other than the declaring corporation, shall be

deemed income. Where the trustee shall have the option of receiving a dividend, either in cash or in the shares of the declaring corporation, it shall be considered as a cash dividend and deemed income, irrespective of the choice made by the trustee.

■ As an intermediate appellate court, the Superior Court is obligated to follow precedent set down by the Pennsylvania Supreme Court. *Kupetz v. Deere & Co., Inc.,* 435 Pa.Super. 16, 32–34, 644 A.2d 1213, 1221 (1994); *Foflygen v. Zemel,* 420 Pa.Super. 18, 34, 615 A.2d 1345, 1353 (1992), *alloc. denied,* 535 Pa. 619, 629 A.2d 1380 (1993). Absent a legally relevant distinction between a previous decision by the Pennsylvania Supreme Court and a case before the Superior Court, we are obligated to follow the mandate of the prior Supreme Court ruling. *Malinder v. Jenkins Elevator & Machine Co.,* 371 Pa.Super. 414, 538 A.2d 509 (1988). Precedents applied to the construction of a will lack unbending control of any case not precisely analogous or strictly identical. *Knoll v. Hart,* 308 Pa. 223, 228, 162 A. 228, 230 (1932); *Heath's Estate,* 286 Pa. 335, 340–41, 133 A. 558, 559–60 (1926); *Joyce's Estate,* 273 Pa. 404, 407–08, 117 A. 90, 91 (1922); *Ashburner's Estate,* 159 Pa. 545, 546, 28 A. 361, 361 (1894); *In re Selser's Estate,* 135 Pa.Super. 480, 484, 5 A.2d 632, 634 (1939). Where the language is almost identical to the language contained in a will previously construed by our Supreme Court, the precedent set is controlling. *In re Lander's Estate,* 416 Pa. 605, 609, 207 A.2d 753, 755 (1965).

Our Supreme Court applied Section 2 of the Principal and Income Act of 1947 to the trust deed of Mary C. Pew and construed the settlor's intention towards her grandsons as follows.

The object and purpose of this proviso was undoubtedly to preserve to every settlor and every testator his basic centuries old right to determine to whom his property should go, and how—whether outright, or conditionally, or in trust, i.e., what he wanted to go to his life tenant as income and what to his remaindermen as principal. In order to ascertain the settlor's meaning and intent, we must therefore interpret

the language and intent of this proviso (which was never intended to negate the settlor's or testator's wishes and intent) in its application to trusts (and wills) created (a) prior to and (b) subsequent to July 3, 1947.

It is still hornbook law that the pole star in every trust (and in every will) is the settlor's (or testator's) intent and that intent must prevail. It would certainly be unreasonable to construe the proviso as intending to destroy or effectually nullify what has always been considered the inherent basic fundamental right of every owner of property to dispose of his own property as he desires, so long as it is not unlawful: *Stoffel's Estate*, 295 Pa. 248, 145 A. 70; *Borsch's Estate*, 362 Pa. 581, 67 A.2d 119; *Grote's Estate*, 390 Pa. 261, 135 A.2d 383; *Brown's Estate*, 408 Pa. 214, 183 A.2d 307. If, therefore, under the language of this 1932 deed of trust the settlor intended small stock dividends to be and go to her life tenant as part of *income*, her intent will be sustained and carried out, even though in this 1932 Trust Deed (and in all pre–1945 trusts) the gift of dividends (and similarly a gift of interest on bonds and on mortgages) or their ascertainment is not specifically spelled out or directed by the settlor.

In *Walton's Estate* 409 Pa. 225, page 231, 186 A.2d 32, page 35, the Court aptly and relevantly said:

" 'No rule regarding wills is more settled than the great General Rule that the testator's intent, if it is not unlawful, must prevail': *Collins Estate*, 393 Pa. 519, 522, 143 A.2d 45, 47. We reiterate what by now is hornbook law: ' "The testator's intention is the pole star in the construction of every will and that intention must be ascertained from the language and scheme of his [entire] will [together with the surrounding facts and circumstances] * * *. *In re Kelsey's Estate*, 393 Pa. 513, 143 A.2d 42; *In re Britt's Estate*, 369 Pa. 450, 87 A.2d 243; *In re Sowers' Estate*, 383 Pa. 566, 119 A.2d 60; *In re Cannistra's Estate*, 384 Pa. 605, 121 A.2d 157." *Saunders Estate*, 393 Pa. 527, 529, 143 A.2d 367, 368. * * *': *Woodward Estate*, 407 Pa. 638, 640, 182 A.2d 732, 733." This same

principle is equally applicable to trusts, both *inter vivos* and testamentary. *Inter vivos* trusts: *Scholler Trust,* 403 Pa. 97, 169 A.2d 554; *Wolters' Estate,* 359 Pa. 520, 59 A.2d 147; testamentary trusts: *Walton's Estate,* 409 Pa. 225, 186 A.2d 32, *supra; Althouse Estate,* 404 Pa. 412, 172 A.2d 146; *Woodward Estate, supra; Britt's Estate, supra; Newlin's Estate,* 367 Pa. 527, 80 A.2d 819.

In order to ascertain the actual intent of the settlor or testator, the Court must place itself in his armchair and consider not only the language and scheme of the instrument but also the facts and circumstances with which he was surrounded; and these surrounding facts and circumstances include the condition of his family, the natural objects of his bounty and the amount and character of his property: *Woodward Estate,* 407 Pa. 638, 640, 182 A.2d 732; *Britt's Estate,* 369 Pa. 450, 455, 87 A.2d 243; *Newlin's Estate,* 367 Pa. 527, 80 A.2d 819. Of course Mrs. Pew's intent must be determined as of the date of the creation of the trust in 1932 and not in 1947, when the Legislature passed the above proviso. *Fischer & Porter Co. v. Porter,* 364 Pa. 495, 72 A.2d 98; 54 Am.Jur. Sec. 18, page 36; 90 C.J.S. Trusts, § 162 (1955). As the Court aptly said in *Schaad v. Hotel Easton Co.,* 369 Pa. 486 page 491, 87 A.2d 227 page 230, " * * * 'no principle is more firmly established than that the laws which were in force at the time and place of the making of the contract enter into its obligation with the same effect as if expressly incorporated in its terms'. *Beaver County Building & Loan Association v. Winowich,* 323 Pa. 483, 489, 187 A. 481, 484. * * *"

We must therefore construe the 1947 proviso in its application to this 1932 trust in the light of her language *which in 1932 had a clear meaning* to laymen, lawyers and Judges alike. To require a settlor (or a testator) who created a trust many (15) years before the Act of 1947 (or any similar Act was passed) "to *expressly* spell out his directions as to what was and was not 'income' and thus express his intent *in the identical* language used or required by a later Act"

would obviously be unreasonable and absurd, and we cannot impute such an intent to the legislature. *See Brown's Estate,* 408 Pa. 214, 227, 183 A.2d 307; *Saunders' Estate,* 393 Pa. 527, 143 A.2d 367. Although no example is needed to illustrate what is so obvious, neither a legislature nor a Court could provide that in *prior* wills and trusts, the words "not income" shall not include interest on bonds, or on mortgages, or *any* stock dividend unless the testator or settlor *specifically and expressly* included them in his gift of "net income."

*Arthur E. Pew, Jr., and settlor's other grandson, Walter C. Pew, the life tenants, were undoubtedly the primary objects of the settlor's bounty.* Their grandmother, Mary C. Pew, the settlor, was the widow of J.N. Pew, who was the founder of the Sun Oil Company. Since 1926 the Sun Oil Company had paid a small yearly cash dividend of $1.00, and since 1913 *small* (6% or less) stock dividends in many years in varying percentages. Every stockholder and especially *every Pew* stockholder knew that that was the well known, established and ordained policy of the Sun Oil Company. While very few lawyers knew or could unravel and very, very, very few laymen knew or had ever heard of Pennsylvania's equitable Rule of Apportionment of extraordinary stock dividends and of proceeds of sale of stock, every lawyer *and every layman* (testator and settlor alike) and every cestui que trust knew that small stock dividends had for over 100 years *always* been considered to belong to the life tenants who were (almost always) the primary objects of the settlor's bounty and not to great grandchildren or unknown or unborn remaindermen. Indeed, if Mrs. Pew had wished and intended all stock dividends (including those which represented earnings) to be a part of principal, such a provision and intent would have been illegal in 1932 as in violation of the then rule against accumulations: *See Warden's Trust,* 382 Pa. 311, 115 A.2d 159; *Cannistra's Estate,* 384 Pa. 605, 121 A.2d 157; Act of April 18, 1853, P.L. 503. The following wise aphorism expressed the thought of all— life tenants who were the primary objects of testator's and

settlor's bounty should not be forced to starve in order that future remaindermen might feast. For many stockholders and certainly for many stockholders of Sun Oil Company stock,—who received only $1.00 a share cash dividends, while shareholders in other large corporations received annually $5.00 or $6.00 or $9.00 a share—these small stock dividends were their bread and butter.

To summarize: We hold ... *it is especially clear that in the light of the facts and circumstances which surrounded Mrs. Pew at the time she created the trust, she gave and intended to give to her grandson Arthur E. Pew, Jr., the life tenant of this trust, the small stock dividends of 6% or less, as well as the cash dividends which were paid annually, or as often as possible, to the owners of the common stock of the Sun Oil Company.*

*In re Trust Estate of Pew, supra* 411 Pa. at 105–10, 191 A.2d at 405–07 (emphasis supplied and added) (footnotes omitted).

█ Instantly, the provisions made in the trust deed of Mary C. Pew for Walter C. Pew are the mirror images of those made for Arthur E. Pew, Jr. in the same trust deed. As our Supreme Court has already applied the Principal and Income Act of 1947 to the trust deed and construed these exact same provisions to hold that the settlor intended to give the life tenant, Arthur E. Pew, Jr., all small stock dividends of six percent or less, this Court is compelled to apply the precedent set in *In re Trust Estate of Pew, supra* to the Walter Trust. Thus, we must hold that the trial court did not err when it upheld the trustees' payment of all stock dividends of six percent or less made between 1948 and 1963 to the life tenant, Walter C. Pew.[6]

**6.** We note that although the Supreme Court reversed the first holding of *In re Trust Estate of Pew, supra* 411 Pa. 96, 191 A.2d 399, that in all trusts created before the effective date of the 1945 Principal and Income Act, a gift of income or net income included small stock dividends of six percent or less, unless the settlor clearly expressed a contrary intent in *In re Estate of Tyler*, 447 Pa. 40, 289 A.2d 441 (1972) (plurality opinion) and *Estate of Tyler, supra;* both Tyler decisions specifically refused to disapprove of the second holding of *In re Trust Estate of Pew, supra,* that in the light of the facts and circumstances which surrounded Mrs. Pew at the time she created the trust, she gave

Next, we must determine whether the trial court properly upheld the trustees' payment of the extraordinary stock dividends to Walter C. Pew between the years 1949 and 1953. The trial court held that the principle of collateral estoppel bars the relitigation of issues regarding the distribution of stock dividends to Walter C. Pew between 1948 and 1963. The trial court held that because the same issues involving identical stock dividends have already been litigated by the appellants through their guardian and trustee *ad litem* in the previous litigation concerning the Arthur Trust, the appellants are barred from relitigating the propriety of the payment of the same stock dividends to Walter C. Pew.

The decision to allow or to deny a prior judicial determination to collaterally bar relitigation of an issue in a subsequent action historically has been treated as a legal issue. *Meridian Oil and Gas Enterprises v. Penn Central Corp.*, 418 Pa.Super. 231, 239, 614 A.2d 246, 250 (1992). Therefore, this Court is not bound by the trial court's conclusion of law and we may draw our own conclusions from the facts as established. *2401 Penn. Ave. Corp. v. Fed. of Jewish Agencies of Greater Philadelphia*, 507 Pa. 166, 172, 489 A.2d 733, 736 (1985); *Meridian Oil and Gas Enterprises v. Penn Central Corp.*, *supra* 418 Pa.Super. at 239, 614 A.2d at 250. Accordingly, our review must focus upon whether the trial court properly utilized the doctrine of collateral estoppel to apply the decisions regarding the payment of stock dividends rendered in the Arthur Trust to the Walter Trust.

Collateral estoppel applies if (1) the issue decided in the prior case is identical to one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment. *City of Pittsburgh v. Zon-*

and intended to give to her grandson, Arthur E. Pew, Jr., the small stock dividends of six percent or less.

*ing Bd. of Adj.*, 522 Pa. 44, 55, 559 A.2d 896, 901 (1989) (citations omitted). The inquiry must be as to the point or issue actually litigated in the prior action. *Zarnecki v. Shepegi*, 367 Pa.Super. 230, 238, 532 A.2d 873, 878 (1987), *appeal denied*, 518 Pa. 643, 542 A.2d 1371 (1988), *citing Keystone Bldg. Corp. v. Lincoln Sav. & Loan Assoc.*, 468 Pa. 85, 91, 360 A.2d 191, 195 (1976).

*Stidham v. Millvale Sportsmen's Club*, 421 Pa.Super. 548, 565–66, 618 A.2d 945, 954 (1992).

According to the rule of collateral estoppel or issue preclusion, when an issue of law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the same parties, whether on the same or a different claim. Restatement (Second) of Judgments § 27 (1982); *Clark v. Troutman, supra*, 509 Pa. [336] at 341, 502 A.2d [137] at 139 [ (1985) ]. "Unlike merger and bar (res judicata), which are applicable only when the same cause of action is asserted, collateral estoppel may apply in any subsequent litigation. On the other hand, collateral estoppel is applicable only to essential issues of fact which have been actually litigated." *In re Estate of R.L.L., supra*, 487 Pa. [223] at 228 n. 8, 409 A.2d [321] at 323–4 n. 8 [ (1979) ]. *Accord: Schubach v. Silver*, 461 Pa. 366, 336 A.2d 328 (1975).

*Zarnecki v. Shepegi*, 367 Pa.Super. 230, 239, 532 A.2d 873, 877–78 (1987), *allocatur denied*, 518 Pa. 643, 542 A.2d 1371 (1988).

■ Guardians and trustees *ad litem* are in a special sense representatives of the court. *In re Kenna's Estate*, 348 Pa. 214, 219, 34 A.2d 617, 619 (1943); *In re Hallstead's Estate*, 338 Pa. 257, 12 A.2d 912 (1940). The purpose of the statutory requirement of *ad litem* representation for minors, born and unborn, and for unascertained persons in orphans' court proceedings is that those persons shall receive notice of the proceedings, and, having been represented, the judgment of the court is effective and conclusive upon all present and future interests. *In re Kenna's Estate, supra* 348 Pa. at 219,

34 A.2d at 619. Guardians and trustees *ad litem* appointed by the orphans' court have the authority to execute binding agreements to settle litigation involving trusts provided such agreements have been approved by the orphans' court. *O'Reilly v. Reading Trust Co.*, 262 Pa. 337, 342, 105 A. 542, 544 (1918).

■ Instantly, the trial court properly applied the doctrine of collateral estoppel to the trustees' payment of the ordinary stock dividends to Walter C. Pew from 1949 to 1963. This exact same issue involving ordinary stock dividends was raised in the 1963 Supreme Court case, *In re Trust Estate of Pew, supra,* which concerned the Arthur Trust. In that case there was a final judgment on the merits regarding the propriety of the trustees' payment of the ordinary stock dividends to Arthur C. Pew, Jr. The appellants were named parties in that case whose interests concerning the remaindermen's rights to the ordinary stock dividends were fully litigated by their guardian *ad litem*.[7] The Supreme Court's determination that the trustees properly paid the ordinary stock dividends over to Arthur E. Pew was essential to the adjudication of the case. Therefore, aside from the fact that our Supreme Court has already determined from its construction of the trust deed that it was the settlor's intent for Walter C. Pew to receive all ordinary stock dividends, the appellants are also collaterally estopped from relitigating the issue of whether the trustees properly paid the ordinary stock dividends over to Walter C. Pew.

■ The application of the doctrine of collateral estoppel to the trustees' payment of the extraordinary stock dividends to Walter C. Pew between 1949 and 1953, however, is problematic. The co-successor trustees assert that the stipulation entered into by the guardian and trustee *ad litem* for the appellants during the litigation concerning the Second Account of the Arthur Trust collaterally estops them from challenging the trustees' payment of the extraordinary stock dividends

7. The appellants, through their father, Walter C. Pew, Jr., had contingent remainder interests in the Arthur Trust which would have come to fruition had Arthur E. Pew, Jr. died childless.

received from 1949 through 1953 to Walter C. Pew. We disagree.

The litigation surrounding the Second Account of the Arthur Trust involved whether the proceeds received from a five for four stock split should be paid over to Arthur E. Pew, Jr. or placed into the trust principal for the benefit of the remaindermen. Arthur E. Pew, Jr. filed an objection to the Second Account contending the five for four stock split was an apportionable event; therefore, the trustees' inclusion of the proceeds of the five for four stock split into the trust principal was improper.

The appellant's guardian and trustees *ad litem* also filed two objections to the Second Account complaining of disbursements from the trust principal to Arthur E. Pew, Jr. labelled "Loans to Life Tenant" of $210,645.71 in cash and 2000 shares of Sun Oil Company stock. *See Pew Trust*, 8 Pa.Fiduc. 241, 242 (1958). The appellants' guardian and trustee *ad litem*, however, raised no objection to the payment of the extraordinary stock dividends during the 1948 through 1955 time period covered by the Second Account of the Arthur Trust.

Subsequently, a stipulation to the pertinent facts concerning the case was entered into by counsel for all parties and approved by the trial court. A portion of the stipulation stated that, after giving effect to all of the stock dividends distributions made to Arthur E. Pew, Jr. during the time period covered by the Second Account, the aggregate book value of the number of shares held by the trustees in the trust principal was greater than the "intact value" to be preserved in the trust principal; thus, all of the stock dividends received during this time period were properly apportioned to Arthur E. Pew, Jr. (Stipulation of Facts as to Apportionment of Certain Shares of Sun Oil Company and the Proceeds of Sale of Certain Shares of Sun Oil Company, paragraphs 6 and 24). The trial court sustained the guardian and trustee *ad litem's* objections to the loans made from the trust principal. The trial court also held that the five for four stock split was not an apportionable event. Arthur E. Pew, Jr. only appealed the issue concerning the apportionability of the five for four stock

split. Therefore, the sole issue before the Supreme Court in the 1960 *In re Trust Estate of Pew* case concerned whether the trustees were compelled to apportion the proceeds of the five for four stock split between Arthur E. Pew, Jr. and the trust principal.

As such, the stipulation entered into by the appellants' guardian and trustee *ad litem* concerning the propriety of the payment of the extraordinary stock dividends to Arthur E. Pew, Jr. was neither a compromise nor a settlement of a point of contention during the litigation of the Second Account of the Arthur Trust which can be utilized to bind the appellants in subsequent litigation involving the propriety of the payment of the extraordinary stock dividends to Walter C. Pew. Nor was the stipulation essential to the decree entered resolving the objections of the guardian and trustee *ad litem* to the Second Account of the Arthur Trust. Thus, the trial court committed error by collaterally estopping the appellants from litigating their objections to the trustees' payment of the extraordinary stock dividends to Walter C. Pew from 1948 to 1953.

Because we have held that the appellants are permitted to maintain their objections to the trustees' payment of the extraordinary stock dividends to Walter C. Pew from 1949 to 1953, we are compelled to determine the propriety of these payments. The appellants contend that our Supreme Court's decision in *In re Catherwood's Trust, supra* 405 Pa. at 61, 173 A.2d at 86 which overruled *Crawford's Estate, supra* 362 Pa. at 458, 67 A.2d at 124 and *In re Pew's Estate, supra* 362 Pa. at 468, 67 A.2d at 129 and held that it was not unconstitutional to give retroactive effect to the Principal and Income Act of 1947 with respect to a trust created before the effective date of the Act rendered the trustees' payment of the extraordinary stock dividends from 1949 to 1953 pursuant to the abolished rule of apportionment improper. The appellants argue that because *In re Catherwood's Trust, supra* 405 Pa. at 61, 173 A.2d at 86 directed that the Principal and Income Act of 1947 was to be applied retroactively to all audits now pending and henceforth, the decision must be applied to the Walter Trust which is now being formally audited for the first time since the Supreme Court's 1949 *In re Pew's Estate* decision which *In re Cather-*

*wood's Trust, supra* 405 Pa. at 61, 173 A.2d 86 overruled. Therefore, the appellants assert that the extraordinary stock dividends which were improperly paid by the trustees to Walter C. Pew from 1949 to 1953 pursuant to the abolished rule of apportionment must be returned to the trust principal for the benefit of the remaindermen.

■ "Fiduciaries who distribute funds in their hands without an accounting and an audit of their accounts do so at their own risk, and when they assume that risk they must be held responsible for payments made without the approval of the court which turn out to have been improper." *Heaney v. Riddle* 343 Pa. 453, 457, 23 A.2d 456, 459 (1942); *see also In re Free's Estate,* 327 Pa. 362, 368, 194 A. 492, 495 (1937); *In re White's Estate,* 322 Pa. 85, 90, 185 A. 589, 591 (1936). Fiduciaries may not be surcharged when they properly rely upon an adjudication of court directing payment of funds in their trust if the right to the trust income was an issue in the court proceedings. *Estate of Sewell,* 487 Pa. 379, 385, 409 A.2d 401, 404 (1979).

■ After our Supreme Court's decision in *Crawford's Estate, supra* 362 Pa. at 458, 67 A.2d at 124 and *Pew's Estate, supra* 362 Pa. at 468, 67 A.2d at 129 until 1961, the trustees, in reliance upon these decisions, followed a policy of distributing all the extraordinary stock dividends of greater than six percent which were received in the years 1949 through 1953 to Arthur E. Pew and Walter C. Pew because, in their judgment, the payment of those extraordinary stock dividends did not effect the "intact value" of the trust principal. The trustees' prudence in following these decisions was bolstered by the fact that four times during this time period, our Supreme Court reaffirmed its ruling that the life tenant of a trust created before the passage of the Principal and Income Act had a constitutional right to receive all stock dividends, both ordinary and extraordinary, except where necessary to preserve the "intact value" of the trust principal. *See Cunningham's Estate,* 395 Pa. 1, 149 A.2d 72 (1959); *Warden's Trust, supra* 382 Pa. 311, 115 A.2d 159; *Jones' Estate,* 377 Pa. 473, 105 A.2d 353 (1954); *Steele's Estate,* 377 Pa. 250, 103 A.2d 409 (1954).

When our Supreme Court overruled *Crawford's Estate,
supra* 362 Pa. at 458, 67 A.2d at 124 and *Pew's Estate, supra*
362 Pa. at 468, 67 A.2d at 129 in the seminal case, *In re
Catherwood Trust, supra,* 405 Pa. at 61, 173 A.2d at 86 holding
that it was not unconstitutional to give retroactive effect to the
Principal and Income Acts of 1945 and 1947, the Supreme
Court abolished the Pennsylvania Rule of Apportionment pro-
spectively. *Id.* 405 Pa. at 78, 173 A.2d at 94. The Supreme
Court specifically held as follows.

In overruling these decisions, we are keenly aware of the
fact that distributions have been made in many estates in
reliance on these decisions and the vitality of the Pennsylva-
nia Rule of Apportionment. *Such distributions are not
affected in any manner by our present ruling.*

*Id.* at 77, 173 A.2d at 93 (emphasis supplied).

In their argument, the appellants conveniently ignore this
holding and instead build their argument around the language
contained in the decision which states that "In all audits now
pending and henceforth, distributions shall be made under the
provisions of the Principal and Income Act of 1947." *Id.* at 78,
173 A.2d at 94. On the basis of this language, the appellants
have asserted that as the distributions of the extraordinary
stock dividends to Walter C. Pew from 1949 to 1953 were
never the subject of a formal adjudication, the Principal and
Income Act of 1947 must be applied to the Walter Trust
pursuant to *In re Catherwood's Trust, supra* 405 Pa. at 61, 173
A.2d at 86. Thus, the appellants maintain that the extraordi-
nary stock dividends paid to Walter C. Pew from 1949 to 1953,
a time when the Pennsylvania Rule of Apportionment was still
the law of this Commonwealth, must be returned by his estate
to the trust principal because the trustees failed to have these
distributions audited before the Pennsylvania Rule of Appor-
tionment was abolished.

This same argument was addressed in by the Philadelphia
County Orphans' Court shortly after the *In re Catherwood's
Trust, supra* decision in *Heyl Estate,* 26 Pa. D & C.2d 654
(1962). In *Heyl Estate, supra,* the distinguished Orphans'
Court judge, the Honorable Harold Durston Saylor, explained

why the same argument raised by the appellants in the instant case is without merit.

The Supreme Court, in speaking of "distributions . . . made in many estates in reliance on . . . the Pennsylvania Rule of Apportionment", was referring to distributions made with and without an audit. That "distributions" was used in this broad sense is seen from the final sentence: "In all audits now pending and henceforth, distributions shall be made under the provisions of the Principal and Income Act of 1947." Clearly, "distributions" as employed in this last sentence, embraces awards made by adjudications upon audits of accounts, otherwise the phrase "in all audits" has no meaning. If "distributions" includes those made pursuant to awards in adjudications for the purpose of construing the last sentence, there is no reason why it does not have the same broad meaning in construing the sentence which excepts prior "distributions" made in reliance on the prior law of apportionment.

A consideration of the purpose of the exception confirms the conclusion here reached. It is manifest that it was the intent of the Supreme Court to preserve for all past transfers the stability and finality which they would otherwise enjoy but for the rule of the Catherwood Trust. The purpose of the court was that Catherwood Trust should not unsettle the past and should have prospective operation only. If awards made under prior adjudications are not protected from the rule of the Catherwood Trust, all prior adjudications and awards thereunder, at least to the extent that the right to take an appeal or obtain a bill of review would still be available, would be unsettled by that decision, contrary to the manifest intent of the court.

The word "distribution", as used in the Catherwood Trust, must be given the meaning of any kind of distribution by any authority. Sight must not be lost of the fact that the Supreme Court necessarily had to bear in mind the problems of estates throughout the Commonwealth; not only in counties, such as Philadelphia, in which there is a separate orphans' court, but also in those in which there is not such a

separate court. The Catherwood Trust exception had to be phrased in such terms that it would embrace the distributions made in counties not having separate orphans' courts, in which counties, prior to this adopting of the present Supreme Court Orphans' Court rules, an accounting in court consisted of filing an account which was called for confirmation. If objections were made, the matter was referred to an auditor. If no objections were made, the account was confirmed and the accountant, without any court order, decree or adjudication, then distributed the estate, and no record thereof was ever made or preserved in the court. The Supreme Court in providing for practice past and present throughout the Commonwealth, therefore, must be deemed to have employed "distribution" to include every kind of transfer from a fiduciary without any distinction as to whether he was acting at his risk or under the authority of an adjudication or some form of order or decree of court.

*Heyl Estate, supra* at 658–60. *See also Erdman Estate*, 28 Pa. D & C.2d 487 (1962); *Keasbey Estate*, 26 Pa. D & C.2d 297, 299 (1961).

Moreover, the appellants' reliance upon *In re Estate of Arrott*, 421 Pa. 275, 217 A.2d 741 (1966) for the proposition that the estate of Walter C. Pew must return the extraordinary stock dividends which were paid to him under the rule of apportionment before it was abolished by the *Catherwood* decision is misplaced. In *Arrott*, unlike the instant case, no distribution of stock dividends to the life beneficiaries were made under the rule of apportionment before the *Catherwood* decision. At the time the Supreme Court abolished the applicability of the rule of apportionment to all trusts created before the passage of the Principal and Income Acts of 1945 and 1947, the trustees' proposed distributions of the stock dividends pursuant to the rule of apportionment were pending before the trial court. Thus, the trustees withdrew their proposed distributions under the rule of apportionment and in their place proposed to distribute the stock dividends to the trust principal in accordance with the Principal and Income Act of 1947. The life beneficiaries filed exceptions to the

proposed distribution of the stock dividends to the trust principal. The trial court dismissed these exceptions.

On appeal, the Supreme Court affirmed the proposed distributions of stock dividends to the trust principal holding that because the proposed distributions were pending before the trial court when the *Catherwood* decision was handed down, this decision was controlling. Therefore, the Supreme Court's decision in *Arrott* does not, as asserted by the appellants, compel the life beneficiaries to return to the trust principal stock dividends that had already been distributed to them before the rule of apportionment was abolished in *Catherwood*. *See also Estate of Brown*, 408 Pa. 214, 183 A.2d 307 (1962) (Pennsylvania rule of apportionment governed distribution under testamentary trust where account had been filed and audit held before Supreme Court's determination in *Catherwood* that in all audits then pending and thereafter, distribution should be made under Principal and Income Act, but the adjudication was filed subsequent to the *Catherwood* decision).

Additionally, neither the Supreme Court's 1972 plurality decision, *In re Estate of Tyler, supra* 447 Pa. 40, 289 A.2d 441, nor its 1977 decision, *Estate of Tyler, supra*, compels the result sought by the appellants in the instant case. The 1972 Supreme Court decision, *In re Estate of Tyler, supra*, involved a trust created by Sidney F. Tyler in 1917 and 1933. When the trustee submitted the first account of the trust in the late 1960's, his proposed distributions included all stock dividends received between April 5, 1932 and the time of the first accounting in the trust principal. One of the life tenants opposed the proposed distributions claiming to have been entitled to all stock dividends of six percent or less received between April 5, 1932 and the date of the first account. *See Tyler Trust*, 48 Pa. D & C.2d 437, 441–42 (1969).

After construing the trust deed, the Supreme Court held that it was the settlor's intent that all stock dividends, both ordinary and extraordinary, "shall be treated and regarded as belonging to the principal of the trust estate and not as income." *In re Estate of Tyler, supra* 447 Pa. at 56, 289 A.2d at 451. The Supreme Court then divided the time span

involved in this case into four time periods reflecting the various different interpretations of the rule of apportionment that were in effect at the time the different stock dividends were received by the trustee. The Supreme Court subsequently applied the interpretation of the rule of apportionment that was in effect at the time each stock dividend was received and directed that the various stock dividends be distributed to either the income beneficiaries or the trust principal in accordance with the interpretation of the rule of apportionment which was in effect at the time the stock dividend was received.[8]

The Supreme Court's 1977 decision, *Estate of Tyler, supra* 447 Pa. 40, 289 A.2d 441, involved a 1919 trust deed that was completely separate and distinct from the trust deed interpreted in the 1972 *Tyler* case. In this case, the income beneficiaries argued that because the 1919 trust deed did not contain the same language found in the 1917 and 1932 trust deed instructing that the stock dividends belonged to the trust principal, it was the settlor's specific intent that the income beneficiaries receive the stock dividends. Thus, the income beneficiaries asserted the Principal and Income Acts of 1945 and 1947 directions that all stock dividends must be classified as principal was overridden by the settlor's intent as permitted by the Acts.

The Supreme Court applied the second holding of the 1963 *Estate of Pew* decision to the trust deed and held that it was not "especially clear" that the settlor intended a different treatment of the ordinary stock dividends in the trust than was ordained by the Principal and Income Acts of 1945 and 1947. Therefore, the Supreme Court held that the dictates of the Principal and Income Acts of 1945 and 1947 must be followed and all stock dividends belonged to the trust princi-

---

8. The Supreme Court upheld all of the proposed distributions of the stock dividends to the trust principal except for those stock dividends received between June 3, 1935 and May 3, 1945. The Supreme Court held that while it was the settlor's intent that all stock dividends be distributed to the trust principal, such a distribution to the trust principal was in violation of the 1853 Act Against Accumulations which was in effect at that time. Therefore, the stock dividends received between June 3, 1935 and May 3, 1945 belonged to the income beneficiaries.

pal. Thus, neither of the *Tyler* cases directed the life beneficiaries to return any extraordinary stock dividends that had already been paid to them in reliance upon the rule of apportionment before the Supreme Court in the *Catherwood* decision abolished its applicability to trusts created before the passage of the Principal and Income Acts of 1945 and 1947. *See generally Estate of Dulles,* 494 Pa. 180, 431 A.2d 208 (1981) (Supreme Court refused to surcharge trustee or compel two of the income beneficiaries to return to the trust principal income that was paid over to them, but not their half sister who was born out of wedlock, in reliance upon a prior court adjudication based upon a statute which prevented a child born out of wedlock from inheriting through her father that was subsequently held to be unconstitutional).

Accordingly, the trustees properly distributed the extraordinary stock dividends received by them from 1949 to 1953 to Walter C. Pew pursuant to the Pennsylvania Rule of Apportionment.[9] Thus, the trial court properly denied the appellants' exceptions concerning the trustees' distribution to Walter C. Pew of both the ordinary stock dividends that were received between 1948 and 1963 and the extraordinary stock dividends that were received from 1949 to 1953 and correctly refused to either surcharge the co-successor trustees for the payment of both the ordinary and extraordinary stock divi-

---

**9.** Under the Pennsylvania rule of apportionment, the "intact value" of the trust principal is its value as of the time the trust came into existence. *In re Waterhouse's Estate, supra* 308 Pa. at 427, 162 A. at 296; *Soles v. Granger,* 174 F.2d 407, 411 (3rd Cir.1949). The presumption is that the extraordinary stock dividends are from earnings and belong to the income beneficiary. *In re Waterhouse's Estate, supra* 308 Pa. at 428, 162 A. at 296; *Soles v. Granger, supra* at 411. Therefore, the burden of proving that the intact value of a trust principal is or will be diminished and that an extraordinary stock dividend or any part of it belongs to the trust principal is on the remaindermen. *In re Waterhouse's Estate, supra* 308 Pa. at 429, 162 A. at 296; *In re Chauncey's Estate,* 303 Pa. 441, 446, 154 A. 814, 815 (1931); *Soles v. Granger, supra* at 411.

Instantly, the appellants have not asserted that the "intact value" of the trust principal was impaired by the distribution of the extraordinary stock dividends to Walter C. Pew from 1949 to 1953. Thus, any claim that the "intact value" of the trust principal was impaired by the trustees' distribution of the extraordinary stock dividends to Walter C. Pew from 1949 to 1953 has been waived.

236

dends or direct the estate of Walter C. Pew to return these same stock dividends to the trust principal for the benefit of the remaindermen.[10] Therefore, the first four issues raised by the appellants in this appeal are without merit.

In their fifth issue on appeal, the appellants allege that the trial court committed error by failing to hold that the trustees breached their fiduciary duty through their failure to properly balance the interest of the life beneficiary and the remaindermen. The appellants argue that the trustees' decision to retain the Sun Oil Company and Oryx stock as the trust's sole investment handsomely benefitted the income beneficiary at the expense of the remaindermen. The appellants assert that it was the trustees' obligation to invest the trust assets in a manner that balanced the life beneficiary's interest in the production of income and the remaindermen's interest in the growth of the principal. Thus, the appellants maintain that the trustees must be surcharged for failing to diversify the trust assets during the lifetime of Walter C. Pew in a manner than would have equally benefitted the life beneficiary and the remaindermen.

A surcharge is the penalty imposed for failure of a trustee to exercise common prudence, skill and caution in the performance of its fiduciary duty, resulting in a want of due care. *Stephenson Estate*, 469 Pa. 128, 138, 364 A.2d 1301, 1306 (1976); *Trust of Munro v. Com. Nat. Bank*, 373 Pa.Super. 448, 452, 541 A.2d 756, 758 (1988). The standard of care imposed upon a trustee is that which a man of ordinary prudence would practice in the care of his own estate. *McCrea Estate*, 475 Pa. 383, 380 A.2d 773 (1977); *In re Musser's Estate*, 341 Pa. 1, 17 A.2d 411 (1941). If a fiduciary has greater skill than that of a person of ordinary prudence, then the fiduciary's standard of care must be judged according to the standard of one having this special skill. *Lohm Estate*,

10. The Superior Court may affirm the decision of the trial court for reasons other than those relied upon by the trial court as long as the result is correct. *Hutchison by Hutchison v. Luddy*, 417 Pa.Super. 93, 113 n. 7, 611 A.2d 1280, 1291 n. 7 (1992), *alloc. granted*, 533 Pa. 660, 625 A.2d 1193 (1993); *Schreffler v. Pa. Ins. Guar. Assn.*, 402 Pa.Super. 309, 586 A.2d 983 (1991).

440 Pa. 268, 269 A.2d 451 (1970); *Stirling's Estate*, 342 Pa. 497, 21 A.2d 72 (1941). Further, a trustee who obtains the appointment as trustee by representing that he or she has greater skill than a person of ordinary prudence that trustee will be held to that higher standard. *Killey Estate*, 457 Pa. 474, 326 A.2d 372 (1974); *Trust of Munro v. Com. Nat. Bank, supra* 373 Pa.Super. at 453 n. 4, 541 A.2d at 758 n. 4.

██ The primary duty of a trustee is the preservation of the assets of the trust and the safety of the trust principal. *In re Flagg's Estate*, 365 Pa. 82, 91, 73 A.2d 411, 416 (1950); *In re Estate of Lychos*, 323 Pa.Super. 74, 470 A.2d 136 (1983). The Restatement of Trusts succinctly states a cardinal principle of trust law which expresses the law of Pennsylvania: "When there are two or more beneficiaries of a trust, the trustee is under a *duty to deal impartially* with them." Restatement (Second) of Trusts § 183 (1959). *See Neafie's Estate*, 325 Pa. 561, 191 A. 56 (1937); *Thompson's Estate*, 262 Pa. 278, 281, 105 A. 273 (1918) ("A trustee has no right to take sides as between the life tenants and remaindermen"). *See also Longbotham's Estate*, 346 Pa. 94, 29 A.2d 481 (1943). The same rule applies where the beneficiaries are successive, and occupy the positions of income beneficiary and remainderman. Restatement (Second) of Trusts § 231. In its comment to section 183, the American Law Institute remarks that "[b]y the terms of the trust, the trustee may have discretion to favor one beneficiary over another. The court will not control the exercise of such discretion, except to prevent the trustee from abusing it." Whether or not the testator has empowered his trustees here to favor the named income beneficiaries over the charitable remainderman, or vice versa, is a question of intent. *Pew Trust*, 411 Pa. 96, 191 A.2d 399 (1963); *Clark v. Clark*, 411 Pa. 251, 191 A.2d 417 (1963); *Scholler's Estate*, 403 Pa. 97, 169 A.2d 554 (1961). That intent must be derived from an examination of the entire will, viewed in the light of the circumstances of the testator. *Anderton v. Patterson*, 373 Pa. 441, 96 A.2d 111 (1953); *Wolters' Estate*, 359 Pa. 520, 59 A.2d 147 (1948).

*In re Estate of Weiss,* 454 Pa. 114, 126, 309 A.2d 793, 799–800 (1973) (emphasis supplied).

> Where, as in the present case, a testator vests a fiduciary with discretion to retain assets, the fiduciary is not thereby excused from the duty of making the retention decision prudently. *Lentz's–[Lentz'] Estate,* 364 Pa. 304, 72 A.2d 276 (1950). It is not, however, *per se* imprudent for an executor, vested with absolute discretion to hold property, to refrain from immediately diversifying a large block of stock received at the commencement of administration. In *Saeger's Estate,* 340 Pa. 73, 76–77, 16 A.2d 19, 21–22 (1940), where a surcharge was sought solely on the ground that the trustee had not diversified holdings, we said:
>
> > Nor does it appear that in any case thus far brought before this Court has a trustee been surcharged solely for the reason now urged. In the absence of controlling precedent and particularly in the absence of such requirement in the statutory law relating to the investment of trust funds, we conclude that . . . there is no authority in the law of this State for the doctrine, contended for by appellants, that trust investments, otherwise legal and entirely proper under all the recognized standards, are necessarily improvident per se for any claimed lack of proper diversification.

*Estate of Knipp,* 489 Pa. 509, 513–14, 414 A.2d 1007, 1009 (1980).

■ Instantly, the trustees and co-successor trustees succeeded in their primary duty to protect and preserve the assets of the trust principal through their policy of continuing to fund the trust principal with shares of Sun Oil Company common stock. The Walter Trust was originally funded in 1932 with twenty thousand shares of Sun Oil Company common stock which had an "intact value" of $816,140.00. When the co-successor trustees presented their Third and Final Account of the Walter Trust which covered the last twenty-five years of Walter C. Pew's life, the trust principal was valued at $7,503,114.86 and included eighty-six thousand shares of Sun Company common stock and eighty-six thou-

sand shares of Oryx Energy Company which was received as a result of a stock split. Thus, the value of the trust principal increased more than nine-fold during the trustees' and co-successor trustees' management of the trust. Therefore, the trustees and co-successor trustees cannot be held to have breached their fiduciary duty regarding the preservation of the trust assets by retaining the Sun Company common stock throughout the lifetime of Walter C. Pew.

■ Next we must determine whether the trustees' and co-successor trustees' policy of continuing to fund the trust with Sun Company common stocks unfairly favored the income interests of Walter C. Pew over the growth interests of the appellants as remaindermen. Our Supreme Court has already ascertained from its construction of the trust deed that the life beneficiary, Walter C. Pew, was undoubtedly the primary object of the settlor's bounty. *See In re Trust of Estate of Pew, supra* 411 Pa. at 108, 191 A.2d at 406. Under these circumstances, the trustees' and co-successor trustees' obligation to deal impartially with the life beneficiary and the remaindermen did not require them to conduct their administration of the trust in such a manner that would ensure that the benefits of the trust would fall equally upon the life beneficiary and the remaindermen. Moreover, the trustees and the co-successor trustees had no obligation under Pennsylvania law to diversify the trust principal by selling the shares of the Sun Company common stock and making another investment when the trust principal, as funded by the settlor, was fulfilling both the income beneficiary's interest in producing income and the remaindermen's interest in the growth of the trust principal. Thus, there is no basis for surcharging the trustees and co-successor trustees for failing to diversify the trust principal during the lifetime of Walter C. Pew and the trial court properly denied this exception.

In their sixth issue on appeal, the appellants maintain that the co-successor trustee, the Glenmede Trust Company, had a conflict of interest and breached their fiduciary duty during the period covered by the supplement to the Third and Final Account of the Mary C. Pew Trust, Sur Trust for Walter C.

Pew, by selling off large blocks of Oryx and Sun Company common stock on behalf of other trusts, funds, estates and accounts that it managed and advising certain of its favored clients to sell the Oryx and Sun Company common stocks while failing to sell the Oryx and Sun Company common stocks held by the Mary C. Pew Trust before the value of these stocks declined. Therefore, the appellants argue that the co-successor trustees should be surcharged in excess of $3,053,000.00 to cover the diminution of the value of the stock which occurred during the time period covered by the supplement to the Third and Final Account plus interest and costs, including reasonable attorney fees. Additionally, the appellants assert that the trial court erred by denying their petition for allowance to conduct discovery upon the Glenmede Trust Company, Ann Pew Curran, Sun Company, and Oryx to determine to what extent the Glenmede Trust Company's decision to sell the Sun Company and Oryx common stocks in other trusts it administered while retaining the same stocks in the Mary C. Pew Trust injured the remaindermen.

A trustee cannot be surcharged for a breach of duty unless the breach caused a loss to the trust. *In re Mendenhall,* 484 Pa. 77, 82 n. 3, 398 A.2d 951, 954 n. 3 (1979). One who seeks to surcharge the trustee for breach of trust must bear the burden of proving the particulars of the trustee's wrongful conduct. *Estate of Stetson* 463 Pa. 64, 84, 345 A.2d 679, 690 (1975). *In re Estate of Feinstein,* 364 Pa.Super. 221, 230, 527 A.2d 1034, 1038 (1987). The propriety of an investment by a trustee must be judged as it appeared at the time it was made and not as viewed in the light of subsequent events. *In re Glauser's Estate,* 350 Pa. 192, 202, 38 A.2d 64, 69 (1944); *In re Saeger's Estate, supra* 340 Pa. at 75–76, 16 A.2d at 21. The mere retention of stocks which the trustee received from the settlor is not, in itself, negligence. *In re Clabby's Estate,* 338 Pa. 305, 314, 12 A.2d 71, 75 (1940). Especially when such stocks have produced a high rate of return for the trust over an extended number of years. *Id.* at 314, 12 A.2d at 75. Hindsight is not the test of liability for surcharge. *Estate of Knipp, supra* 489 Pa. at 512, 414 A.2d at

1008. *Mereto Estate*, 373 Pa. 466, 469, 96 A.2d 115, 116 (1953). To make after-sight the sole judge of the trustee's prudence would be manifestly unfair. *In re Clabby's Estate, supra* 338 Pa. at 315, 12 A.2d at 75.

 Instantly, under the appellant's view of the law, the co-successor trustees must be deemed liable for a surcharge because the market value of Sun Company common stock and Oryx common stock diminished during the time period covered by the supplement to the Third Account. Under the appellants' theory of trustee liability for surcharge, the reviewing court should disregard the long-term performance of a stock which is part of the trust principal and focus instead upon its short-term performance during a narrow time period, and if the value of the stock declines, the trustees are subject to a surcharge for the loss. This Court declines to adopt such a view of the law, and will review the co-successor trustees' liability for a surcharge based upon their long-term performance.

Over the long haul, the decisions of the original trustees and the co-successor trustees to continue to fund the trust principal with the Sun Company common stock and later the Oryx common stock has proven to be a wise decision. The performance of the Sun Company common stock over the more than sixty years of the trust's existence has provided both income for the life beneficiary and growth in the trust principal for the remaindermen in a trust whose primary purpose was to provide income for the life beneficiary. The value of the trust principal, even after the decline of the price of the Sun Company and Oryx common stock during the time period covered by the supplement to the Third Account, was still more than five times greater than its value on the date of its establishment by the settlor. Thus, the co-successor trustees' decision to retain the Sun Company and Oryx common stock has, over the long term, proven beneficial to the overall growth of the trust principal, and in light of this strong performance during the existence of this trust, the decline in the prices of these stocks during the short period covered by the supplement to the Third Account cannot be utilized as a

basis for the appellants' allegations that the co-successor trustees breached a duty which caused a loss to the trust.

Moreover, it would be manifestly unfair of this Court to permit trust beneficiaries, armed with the twenty-twenty laser-like vision of hindsight, to focus in upon any short term time period during the course of the trust's administration when the price of the stocks forming the trust principal had declined as a basis for subjecting the trustees to a surcharge for failing to sell the stocks, when the overall long-term performance of the same stocks led to a five-fold growth in the value of the trust principal. Therefore, the appellants have failed to allege sufficient facts in their objections that the trustees' breach of duty caused a loss to the trust and the trial court properly dismissed this objection.[11] Additionally, because the trust suffered no loss, the trial court properly dismissed the appellants' petition for allowance of discovery against the Glenmede Trust Company, Ann Pew Curran, Oryx Energy Company and the Sun Company with prejudice.

In their seventh issue on appeal, the appellants contend that the trial court misapplied the law when it failed to disqualify the law firm of Pepper, Hamilton & Scheetz from attempting to represent the co-successor trustee of the Walter Trust, The Glenmede Trust Company, the executors of Walter C. Pew's will and the co-trustees of Walter C. Pew's 1986 agreement of trust. The appellants contend that the trial court erred in its assessment that as neither of the appellants were named beneficiaries under the will of Walter C. Pew or the 1986 agreement of trust, no conflict could arise until such time that the appellants prevailed in the objections to the Walter Trust and the court directed the co-successor trustees of the Walter Trust to seek reimbursement from the estate of Walter C.

11. Moreover, we note that the appellants who together have a one-sixth remainder interest in the trust principal are the only remaindermen who have filed objections to the co-successor trustees' decision to retain the Sun Company and Oryx common stock during the period covered by the supplement to the Third Account. The other six remaindermen whose combined remainder interests consists of five-sixths of the trust principal have not objected to the co-successor trustees' decision to retain the Sun Company and Oryx common stock during the time period covered by the supplement to the Third Account.

Pew and/or from assets contained in the 1986 agreement of trust. The appellants further claim that the conflict of interest was not resolved by the replacement of Pepper, Hamilton & Scheetz as counsel for the executors of the estate of Walter C. Pew and the co-trustees of the 1986 agreement of trust as to any areas of potential conflict by the firm of Smith, Aker, Grossman and Hollinger because one of the members of the firm, M. Paul Smith, previously represented the appellants in his capacity as guardian and trustee *ad litem* in two prior cases concerning the Arthur Trust which the trial court subsequently held to collaterally estop the appellants from challenging the distribution of the stock dividends to Walter C. Pew from 1948 to 1963. Additionally, the appellants assert that the firm of Pepper, Hamilton & Scheetz's continued ties to the co-successor trustee of the Walter Trust, the executors of the estate of Walter C. Pew and the co-trustees of the 1986 agreement of trust impairs its ability to evaluate the courses of action available to the co-successor trustee of Walter Trust with regard to potential claims against the estate of Walter C. Pew or assets contained in the 1986 agreement of trust.

Under the common law, an attorney owes a fiduciary duty to his client. *Maritrans v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 253, 602 A.2d 1277, 1283 (1992). This fiduciary duty demands individual loyalty and prohibits the attorney from engaging in conflicts of interest. *Id.* An attorney may not represent conflicting interests. *Commonwealth ex rel. Whitling v. Russell,* 406 Pa. 45, 176 A.2d 641 (1962). The test of whether an attorney has conflicting interests so as to preclude his representation of a party is not actuality of conflict, but possibility that a conflict may arise. *Middleberg v. Middleberg,* 427 Pa. 114, 233 A.2d 889 (1967). An attorney will not be permitted to represent conflicting interests unless those interests agree to be so represented. *Seifert v. Dumatic Industries Inc.,* 413 Pa. 395, 197 A.2d 454 (1964).

An attorney is prohibited from undertaking a representation adverse to a former client in a matter "substantially related" to that in which the attorney previously had served

the client. *Maritrans v. Pepper, Hamilton & Scheetz, supra* 529 Pa. at 256, 602 A.2d at 1284. The fact that the two representations involved similar or related facts is not, in itself, sufficient to warrant the finding of a substantial relationship so as to disqualify the attorney from the representation, but, rather the test is whether information acquired by an attorney in his former representation is substantially related to the subject matter of subsequent representation. *Commonwealth Ins. Co. v. Graphix Hot Line*, 808 F.Supp. 1200, 1204 (1992). If the attorney might have acquired confidential information related to the subsequent representation, Pennsylvania Rule of Professional Conduct 1.9 would prevent the attorney from representing the second client. *Richardson v. Hamilton Int'l Corp.*, 469 F.2d 1382, 1385 (1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). Confidential information gained by one member of a law firm is imputable to other members of the same law firm. *See Maritrans v. Pepper, Hamilton & Scheetz, supra* 529 Pa. at 241, 602 A.2d 1277. Therefore, a former client seeking to disqualify a law firm representing an adverse party on the basis of its past relationship with a member of the law firm has the burden of proving: (1) that a past attorney/client relationship existed which was adverse to a subsequent representation by the law firm of the other client; (2) that the subject matter of the relationship was substantially related; (3) that a member of the law firm, as attorney for the adverse party, acquired knowledge of confidential information from or concerning the former client, actually or by operation of law. *City of Cleveland v. Cleveland Elec. Illuminating*, 440 F.Supp. 193, 207 (1977), *affirmed*, 573 F.2d 1310 (1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978); 7A C.J.S. Attorney and Client § 164.

 Although the interests of the co-successor trustee, the Glenmede Trust Company, and the interests of the executors of the estate of Walter C. Pew and the co-trustees of the 1986 agreement of trust are seemingly the same in that all contend that the stock dividends were properly paid to Walter C. Pew from 1948 to 1963; the possibility that a conflict between the

interests of these parties could have arisen if the trial court had determined that the stock dividends were wrongfully paid over to Walter C. Pew. The law firm of Pepper, Hamilton & Scheetz then would have been placed in the incongruous position of having to assert on behalf of the Glenmede Trust Company that the 1964 receipt and release agreement covering all distributions made by the trustees between 1948 and 1964 released it from any obligation to return these stock dividends, while at the same time asserting on the behalf of the executors of the estate of Walter C. Pew and the co-trustees of the 1986 agreement of trust that the co-successor trustees of the Glenmede Trust Company and Ann Pew Curran bore the responsibility of returning to the trust principal any stock dividends that were wrongfully paid to Walter C. Pew. Faced with the potential conflict of interest, Pepper, Hamilton & Scheetz properly withdrew its representation of the executors of the estate of Walter C. Pew and the co-trustees of the 1986 agreement of trust in this matter while continuing its representation of all three parties in other unspecified matters that are not presently before this Court. Had the trial court determined that the stock dividends were wrongfully paid to Walter C. Pew, Pepper, Hamilton & Scheetz would have been compelled to completely cut all ties to the executors of the estate of Walter C. Pew and the co-successor trustees of the 1986 agreement of trust. However, as the trial court properly held, the point where Pepper, Hamilton & Scheetz would have had to totally disengage itself from any association with the executors of the estate of Walter C. Pew and the co-trustees of the 1986 agreement of trust had not been reached.

Next, we must determine whether replacement counsel, J. Brooke Aker, Esq., of the law firm of Smith, Aker, Grossman and Hollinger should be precluded from representing the executors of the estate of Walter C. Pew and the co-trustees of the 1986 agreement of trust due to his law partner's, M. Paul Smith, Esq.'s, previous representation of the appellants as their guardian *ad litem* or trustee *ad litem* in two previous cases concerning the Arthur Trust which were used by the

trial court as its basis for collaterally estopping the appellants from disputing the distribution of stock dividends to Walter C. Pew from 1948 to 1963. Applying the three part test enumerated in *City of Cleveland v. Cleveland Elec. Illuminating, supra,* the appellants have not met their burden in order to disqualify Mr. Aker from representing the executors of the estate of Walter C. Pew and the co-trustees of the 1986 agreement of trust due to a conflict of interest. Although the appellants have established a previous attorney/client relationship between themselves and Mr. Smith, a partner in the same law firm as Mr. Aker, and they have established that the subject matter was substantially related, the appellants have failed to establish that Mr. Smith either actually or by operation of law acquired any confidential information concerning his former clients. Mr. Smith was appointed guardian and trustee *ad litem* by the trial court in two cases involving the Arthur Trust. The issues involved in both these cases were purely questions of law. The first case involved the apportionability of stock dividends received as a result of a stock split, while the second case involved the applicability of the *Catherwood* decision to the Arthur Trust. Due to the nature of Mr. Smith's previous representation of the appellants, neither appellant has asserted that they imparted any confidential information to Mr. Smith. As Mr. Smith's representation of the appellants more than thirty years ago was of an extremely limited nature in which he had access to no confidential information concerning the appellants, we hold that his law partner, Mr. Aker, is not barred from acting as counsel for the executors of the estate of Walter C. Pew and the co-trustees of the 1986 agreement of trust. *See Maritrans v. Pepper, Hamilton & Scheetz, supra* 529 Pa. at 241, 602 A.2d 1277. *See generally In re Estate of Coulter,* 406 Pa. 402, 178 A.2d 742 (1962); *In re Trimble's Estate,* 392 Pa. 277, 140 A.2d 609 (1958).

In their final issue on appeal, the appellants contend that the trial court erred by granting the executors of the estate of Walter C. Pew's and the co-trustees of the 1986 agreement of trust's preliminary objections to the objections the appellants filed to the First and Partial Account of the 1986 agreement of

trust. The appellants argue that the trial court's two bases for granting the preliminary objections: (1) that the time for raising a lack of capacity and/or undue influence objection to Walter C. Pew's will and the 1986 agreement of trust had passed, and (2) the objections had failed to comply with Montgomery County Local Rule 6:10A(3), Pa.R.Civ.P. 1019(h) and the trial court's decree of May 18, 1992, cannot withstand appellate scrutiny. The appellants assert that although they filed no objections to the will within the time period allotted by 20 Pa.C.S.A. § 908, the 1986 agreement of trust which the trial court held was incorporated into the will by reference was never submitted to probate. Therefore, the appellants maintain that they cannot be barred by the one-year time limitation set out by 20 Pa.C.S.A. § 908 from objecting to the 1986 agreement of trust when the document was never probated.

Additionally, the appellants claim that their lack of capacity and/or undue influence objections to the First Account of the estate of Walter C. Pew fully comply with Montgomery County Orphans Court Division Rule 6:10A(3) which requires objections to accounts to "set forth briefly the reason or reasons in support thereof." Thus, the appellants claim that they are entitled to an evidentiary hearing on the validity of the 1986 agreement of trust.

■■ The presumption of the validity of a will arises once a will is probated. *Burns v. Kabboul,* 407 Pa.Super. 289, 307, 595 A.2d 1153, 1162 (1991), *alloc. denied,* 529 Pa. 655, 604 A.2d 247 (1992).

"When a last will has been admitted to probate, the legal presumption at once arises that the will so probated is a last will, and is the free and voluntary expression of a testator, of sound and disposing mind and understanding, as to the disposition the testator desired to make of his property upon his death. Where the decree of the register is unappealed from within the period allowed for such appeal, the legal presumption becomes conclusive, and it makes an end to questions passed upon, or within the jurisdictional power of the register to consider, touching the validity of the will."

*Bunce v. Galbraith [Galbrath],* 268 Pa. 389, 112 A. 143 (1920). *See, Estate of Shelly,* 463 Pa. 430, 345 A.2d 596 (1975).

*In re Estate of Kiger,* 487 Pa. 143, 147, 409 A.2d 5, 7 (1979). Probate, however, is not conclusive as to extraneous matters or matters outside the record, nor is it conclusive as to matters not involved in or properly determinable upon probate. *Hickman's Estate,* 308 Pa. 230, 235–36, 162 A. 168, 170 (1932); *Baum's Estate* 260 Pa. 33, 103 A. 614 (1918).

 An extrinsic writing may be incorporated into a will or codicil by reference, provided it is clearly identified in that document and is in existence at the time the will was written. *In re Kretz's Estate,* 410 Pa. 590, 598, 189 A.2d 239, 243 (1963); *In re Sciutti's Estate,* 371 Pa. 536, 538–39, 92 A.2d 188, 189 (1952); *In re Hogue's Estate,* 135 Pa.Super. 543, 548, 6 A.2d 108, 110 (1939). An *inter vivos* trust deed, clearly identified and referred to by the settlor's will is incorporated in the will as part thereof under the doctrine of incorporation by reference. *In re Wilson's Estate,* 363 Pa. 546, 549, 70 A.2d 354, 355 (1950); *In re Grubb's Estate,* 263 Pa. 468, 106 A. 787 (1919). Documents which are incorporated by reference into the testator's will are to be probated. *In re Dreisbach's Estate,* 384 Pa. 535, 541, 121 A.2d 74, 77 (1956).

 Instantly, the executors of the estate of Walter C. Pew offered the will for probate six days after his death. The will specifically mentioned various beneficiaries including the co-trustees of the 1986 agreement of trust. However, the 1986 agreement of trust was not offered for probate with the will. Due to the appellants' failure to object to the will within the one-year time period allotted by 20 Pa.C.S.A. § 908, the trial court dismissed as untimely the objections that the 1986 agreement of trust was the product of lack of capacity and/or undue influence. We hold that the trial court committed error by ruling that the appellants are barred by 20 Pa.C.S.A. § 908 from raising objections to the 1986 agreement of trust which was incorporated into the will by reference but never itself submitted to probate.

Our reasoning for this conclusion is as follows. While a legal presumption arises that the register of will's probate decree of the probated will is the decedent's last will and is the free and voluntary expression of the testator, of sound disposing mind and understanding, as to the disposition which he desired to make of his property upon his death and such a legal presumption becomes conclusive when that decree is not appealed from within the time allotted by 20 Pa.C.S.A. § 908, this same decree is not conclusive as to documents outside the probate record. Therefore, while the trial court properly held that the appellants were barred by 20 Pa.C.S.A. § 908 from raising challenges to the probated will and the distributions made therein, including the distribution of three hundred and seventy thousand shares of Sun Company common stock and three hundred and seventy thousand shares of Oryx common stock to the co-trustees of the 1986 agreement of trust, it committed error by also barring the appellants from specifically objecting to the validity of distributions made pursuant to the 1986 agreement of trust which, while incorporated by reference into the will, was never submitted to probate. Thus, while the decree of probate was conclusive of the validity of the will, the same decree is not conclusive concerning the validity of the distributions to be made pursuant to the 1986 agreement of trust.

Because the 1986 agreement of trust was incorporated by reference into the will, it should have been offered for probate at the same time that the will was offered for probate. *See In re Dreisbach's Estate, supra* at 541–42, 121 A.2d at 78. Thus, we direct the executors of the estate of Walter C. Pew and the co-trustees of the 1986 agreement of trust to submit this document to probate at which time the appellants can raise any objections that they may have concerning whether the distributions that are to be made pursuant to this document are the product of the settlor's alleged lack of capacity and/or undue influence.[12]

12. Based on our decision that the 1986 agreement of trust was incorporated into Walter C. Pew's will by reference and therefore must be submitted to probate, we will not consider whether the appellants'

Based upon the foregoing, the portion of the trial court's final decree dismissing the appellants' objections to the Third and Final Account and the supplement to the Third and Final Account of the Mary C. Pew Trust, Sur Trust for Walter C. Pew is affirmed. Additionally, the portion of the trial court's final decree which dismisses with prejudice the appellants' petition for the allowance of discovery is also affirmed. Finally, the portion of the trial court's final decree which dismissed the appellants' objections to the First and Partial Account of the estate of Walter C. Pew concerning the appellants' assertions of attorney conflict of interest is affirmed, while the portion of the final decree dismissing as untimely the appellants' objections that the 1986 agreement of trust is the product of lack of capacity and/or undue influence is reversed and the executors of the estate of Walter C. Pew and the co-trustees of the 1986 agreement of trust are directed to submit this document to probate.

Decree affirmed in part, reversed in part.

objections to the First and Partial Account of the estate of Walter C. Pew comply with Montgomery County Local 6:10(A)(3). Additionally, we note that the appellants have standing to assert such objections to the 1986 agreement of trust based upon their status as intestate heirs through their deceased father in the event that the three hundred and seventy thousand shares of Sun Company and three hundred and seventy thousand shares of Oryx are directed to be distributed in accordance with 20 Pa.C.S.A. § 2103. *See In re McKee's Estate*, 378 Pa. 607, 108 A.2d 214 (1954).