**Estate of Angle**

C.P. of Franklin County, no. 107 of 1998.

*Kendra D. McGuire,* for contestants Faye Heinbaugh, Paul Angle and Joseph Angle.

*James M. Stein,* for proponent Cline.

*John W. Frey,* for proponent Spielman.

*Ronald E. Angle,* pro se, proponent.
*James Angle,* pro se, proponent.

HERMAN, *J.,* March 21, 2000—

## INTRODUCTION

Before the court is an appeal from probate contesting the last will and testament of decedent Amos A. Angle, a widower, who died October 31, 1997 at age 83. Mr. Angle's will was dated April 14, 1997 and probated on June 22, 1998 by the Franklin County Register of Wills. The parties are Mr. Angle's adult children. The contestants of the will are Faye Heinbaugh, Paul Angle and Joseph Angle, and the proponents are Ronald Angle, Martha Spielman and Elizabeth Cline.[1] Contestants Paul and Joseph Angle were not present at trial. Ronald Angle appeared pro se at trial and participated on his own behalf. The other two respondents, Martha Spielman and Elizabeth Cline, were represented by separate counsel at trial. The petitioners were jointly represented by the same counsel. Although James Angle was named as a proponent in this litigation, he did not obtain counsel to represent him and testified at trial in favor of the contestants. The estate is represented by Attorney J. Denny Guyer, Esquire. Attorney Guyer informed the court and counsel

---

1. Under section 908(a) of the Probate, Estates and Fiduciaries Code, 20 Pa.C.S. §101 et seq., the petitioners are formally designated as "contestants" and the respondents are "proponents" of the will. Counsel referred to the parties as "petitioners" and "respondents" at trial and marked their exhibits accordingly. We will use the statute's terminology for purposes of this adjudication.

shortly after the pretrial conference that he did not intend to appear on behalf of the estate to oppose the petition. The contestants allege their father lacked testamentary capacity when he executed the April 14 will or in the alternative, the proponents exercised undue influence over Mr. Angle during the period leading up to the will's execution.

Mr. Angle made a will on June 25, 1982 which granted his daughter Elizabeth (Libby) Cline one acre of mountain land on Hunter Road in Montgomery Township and the trailer situated on that land. The house located on Hunter Road and its surrounding 11 acres of mountain land were to pass through the residuary clause and be divided equally among Mr. Angle's children in a 9/10 share, with a 1/10 share left to the church.[2] Mr. Angle at that time had 10 children, three of whom died after the 1982 will was executed. The will granted various items of personal property to Ronald, James, Joseph, Martha and Faye's husband, Dean. These items are not in dispute. Counsel for the parties and the parties themselves indicated at trial the total acreage of the Hunter Road property is 12 acres. We note this conflicts with contestants' exhibit no. 12 which indicates the property consists of more than 16 acres. James and Ronald Angle were named as co-executors of the 1982 will.

The April 14, 1997 will granted Libby *two* acres of the Hunter Road property improved with both the trailer *and* the house. The rest of the Hunter Road property consisting of 10 acres of mountain land was left to Ronald.

---

2. Contestants' exhibit no. 4: June 25, 1982 will.

Martha received a life estate in a house on Two Top Road in Mercersburg. The remainder of the estate was to be divided as before, with 1/10 left to the church and the other 9/10 divided equally between the children.[3] James and Ronald were again named co-executors. The 1997 will was prepared by Mr. Angle's attorney, Thomas B. Steiger Jr., Esquire, and witnessed by Attorney Steiger and his secretary.

Mr. Angle's probate estate is worth approximately $300,000, with the real estate being the most valuable part of the estate. The property on Two Top Road was appraised at $75,000-$80,000 and the Hunter Road property was appraised at $84,000-$99,000. These appraisal figures are not in dispute.[4]

The contestants allege Mr. Angle suffered from Alzheimer's disease and it was this disease which prevented him from having the capacity to make the April 14, 1997 will, and also allowed the proponents to exercise undue influence over him in order to obtain for themselves greater benefits than they would have received under the 1982 will.

## BACKGROUND

Mr. Angle and his wife had 10 children, three of whom died of cancer after the execution of the 1982 will. The remaining children live in the Franklin County area with the exception of contestant Joseph Angle who lives in

---

3. The personal property bequests remained essentially the same as in the 1982 will. (Contestants' exhibit no. 3.)

4. Contestants' exhibit no. 7.

Utah. Mr. Angle built the house on Hunter Road in the late 1950s and also owned the house on Two Top Road where he lived until he entered a nursing home two months before his death. Although he retired from his full-time occupation as a carpenter many years before the events at issue in this case, he remained physically active in his later years with carpentry and handyman projects. He attended his grandchildren's sports events, attended church regularly and maintained his own properties, cutting the grass and shoveling coal and snow even in the last few months of his life. He rode his bicycle several miles almost daily and continued to drive his car and attend family gatherings and vacations. He also enjoyed hunting in state and out west with his son-in-law Dean Heinbaugh and youngest son Ronald.

By all accounts, Mr. Angle had always been an independent, self-reliant man. He could be stubborn, occasionally bossy and gruff, and was undeterred by the opinions of others. Despite these sterner traits and a frugal nature, he was a generous man who donated his time and skills to family, neighbors and friends on their home repair projects, although he had been retired for many years. He had a history of allowing people to live on his properties so long as there were no problems and frequently gave his grandchildren small amounts of money for meals, toys and other amusements.

After Mr. Angle's wife died in 1974, he continued to live in the house on Two Top Road. His daughter Martha Spielman, one of the proponents of the 1997 will, moved in with him after she and her husband John separated in 1979. Mr. Angle and Martha lived at Two Top Road together until he entered the nursing home. She worked as

a certified nursing assistant and had a varied schedule which included evening classes beginning in 1996. Martha and her father had their own lives and went their own ways for the most part. Although she occasionally prepared meals for him, they usually did their own cooking. She cleaned house, did her father's laundry and reminded him to take his medications. Mr. Angle paid the household bills, mowed the grass and did minor maintenance tasks around the house. He did not charge Martha rent.

Mr. Angle allowed Martha's estranged husband to live in a trailer a short distance from the house, much to Martha's chagrin. She and her father often fought about the matter, with their arguments intensifying in the years before Mr. Angle's death. Mr. Angle never yielded despite Martha's strong feelings on the subject, because he and Mr. Spielman got along well. Mr. Spielman testified he told Mr. Angle in 1993 he wanted to buy the land on which his trailer sits, but Mr. Angle refused because he wanted Martha to have a place to live and did not want to sell the land out from under her. Although Mr. Angle once mentioned to family members he would like to see Martha get out on her own, there was no evidence he ever tried to charge her rent or place other financial demands on her to induce her to move out.

Proponent Libby Cline and her husband Dave lived for several years in a trailer on Mr. Angle's Hunter Road property with their three children, while a tenant lived in the house. Libby became unexpectedly pregnant with her fourth child in 1993 after undergoing reconstructive surgery following a bout with breast cancer, despite having undergone a tubal ligation in 1986. She asked her father

if she and her family could move into the house for the extra space, and he agreed. Libby testified she told her father she wanted to buy the house but he refused payment telling her "It's your home." She and her family refurbished the house in the summer of 1993 using $5,000 of their own money and a $10,000 bank loan. Mr. Angle also contributed some funds for the work. The Cline family moved into the house in early September. Libby testified she put money into the house based on her father's assurances that she could live there for the long term.

Proponent Ronald Angle, Mr. Angle's youngest son, lived near his father's home on Two Top Road. They enjoyed a very close relationship for many years and often spent time together hunting, working on carpentry projects and attending family gatherings. Mr. Angle was also close with Ronald's two sons and his wife Ruth. According to Rex Sanders, who was Libby's neighbor and friend and also a friend of Mr. Angle, Mr. Angle indicated a desire in 1993 to update his will to leave Ronald the Hunter Road mountain land so that Ronald could pass the land down to his own two sons, thereby keeping the land in the Angle name.

Mr. Angle spent most of his time between the summer of 1993 and his admission to a nursing home in August of 1997 at Hunter Road with Libby's family. He was very attached to Libby's children, including Alicia, the fourth child who was born with Down's Syndrome. He had a key to the house and drove, walked or rode his bicycle there as often as three times a day to share meals, visit the children and accompany the family on errands and outings. There was no evidence Libby ever changed the locks to keep her father out.

Libby testified she frequently offered to pay for the Hunter Road house but her father would refuse, telling her "It's your home." According to both Ronald and Mr. Sanders, Mr. Angle indicated his desire in 1993 to give Libby the house outright because he believed Libby would never be able to buy it anyway. Feeling he had enough money for his modest needs, Mr. Angle often gave the excess in his social security check to Libby for her family's daily expenses and for deposit into bank accounts for her children's benefit.

The evidence clearly showed long-standing tensions and jealousies between Mr. Angle's children. The source of the tension was the belief on the part of the contestants and their spouses, that Libby and Martha were taking advantage of Mr. Angle's generosity, and Libby's children were being favored over his other grandchildren. Libby's adult daughter Billy testified she stopped attending family gatherings in 1995 or 1996 when she was in high school because of the negative comments made by some of her relatives about her parents. It was clear from her testimony she had been very fond of her grandfather and was distressed by the negative comments from some of her family members.

According to the undisputed evidence, Mr. Angle became somewhat forgetful beginning in the early 1990s, but increasingly so in 1994 and 1995. He underwent treatment for prostate cancer in 1995 and 1996, and occasionally missed doctor appointments unless reminded. He sometimes became disoriented on hunting trips with Ronald and Dean Heinbaugh. Ronald continued to go hunting in state with his father but stopped taking him out west to hunt and kept a close eye on him. Mr. Angle

was involved in two minor car accidents in 1996 but continued to drive regularly. He often babysat Mr. Sanders' children and drove them to ball games and Sunday school. Mr. Angle also continued to handle his own personal and financial affairs without assistance until sometime in the fall of 1996.

Thomas B. Steiger Jr., Esquire, was Mr. Angle's legal counsel and drafted his 1982 will. Mr. Angle stopped by Attorney Steiger's Mercersburg office unaccompanied in October of 1996 indicating he wanted to change his will to leave additional acreage to Libby. They did not discuss the changes in more detail at that time because Mr. Angle did not have an appointment.

Toward the end of 1996, bank officers began to notice Mr. Angle having difficulty with transactions. He could complete a transaction without assistance but would return a short time later to conduct the same transaction again. Bank officers told Ronald his father made a large withdrawal from one of his accounts and Ronald testified this concerned him, because he wanted to make sure his father kept his money for his own needs. Ronald was told he could do nothing about the problem without a power of attorney, however.

Around this same time, Libby asked her father for a $30,000 loan. Her husband had suffered a work-related back injury in 1996 but was denied workers' compensation benefits, and approximately $9,000 of his unpaid bills were on the Clines' credit cards. Also on their credit cards was $5,000 in unpaid bills stemming from Libby's reconstructive breast surgery. Libby testified her father asked "How much do you need? I have money I'll never spend." Mr. Angle cashed out a $50,000 certificate of

deposit, gave Libby $30,000 and put the remaining $20,000 into a new certificate.

Libby discovered in late 1996 her father sometimes threw unpaid bills into the trash and had allowed his vehicle license and registration to expire even though he continued to drive almost every day. Mr. Angle acknowledged he needed help with bill paying and asked Libby to become his attorney in fact. She testified she declined because she felt her debt to him created a conflict of interest. After getting Ronald's input, she suggested to her father that Ronald could fill that role. Ronald testified he agreed a power of attorney was a good idea because he could see his father was aging more quickly than before. It was during these discussions Ronald learned of his father's loan to Libby.

Mr. Angle agreed to have Ronald as his attorney in fact. Before having the document prepared, Ronald contacted his siblings to find out whether they objected to him becoming attorney in fact and to get their advice. Although everyone was in favor of the idea, Ronald's brother James warned Ronald to use the power of attorney only for bill paying and not for conducting any transactions related to their father's real estate.

Mr. Angle signed a power of attorney on January 7, 1997 at Attorney Steiger's office. Ronald and his wife Ruth, whom Attorney Steiger knew from prior occasions, were also present. Attorney Steiger explained to them the purpose of the document was to allow Ronald to assist his father in handling his financial affairs.[5] Ronald mentioned to Attorney Steiger that James wanted the

---

5. Contestants' exhibit no. 8.

power of attorney used only to pay bills, but Attorney Steiger believed there should be no such restrictions in the event the mountain land had to be sold to raise funds for any of Mr. Angle's future medical expenses.

Attorney Steiger testified he did not ask why a power of attorney was being sought at that time because it is a very natural thing for older persons to do. He did not conduct any particular tests to determine Mr. Angle's capacity to execute the power of attorney because there were no indications he was having difficulty understanding the document or its purpose, nor was there any indication he was being coerced or manipulated. During the meeting Mr. Angle again mentioned his desire to change his will, so Attorney Steiger gave Ronald and Mr. Angle a copy of the 1982 will to take along to hammer out whatever changes Mr. Angle wanted to make.

As attorney in fact, Ronald paid his father's outstanding bills and arranged for the automatic payment of utility bills and direct deposit of his social security check. Libby signed a promissory note at Ronald's request on February 18, 1997 to repay the $30,000 she borrowed from her father.[6] She had already made a payment to her

---

6. Contestants' exhibit no. 9: "Loan agreement repayment schedule. I, Ronald E. Angle, power of attorney for my father Amos A. Angle, will collect funds owed to Amos by his daughter, Elizabeth Cline. $30,000 borrowed by Elizabeth on December 14, 1996 will be repaid at $550 due on the 15th of each month for a total of 60 payments. This represents a total of 10 percent interest over a five-year period, 3.9 percent APR. If payments are received after the 15th of the month, that month's interest will be added to the principle." A total of $551.14 was due monthly. The note was signed by Mr. Angle and Ronald on February 7 and by Libby on February 18, 1997.

father even before signing the note. Libby made regular monthly payments between February and October 1997 under the note.[7] Although Ronald endorsed some checks for his father as attorney in fact, Ronald testified his father continued to write his own checks to cash for daily expenses after January of 1997.

Libby testified that in late 1996 and early 1997, her father knew he still had prostate cancer and knew he was "going downhill." Concerned about his increasing forgetfulness and fearing his cancer had spread, Libby took him to see his physician Dr. W. David Kent M.D., on January 14, 1997. Dr. Kent, who cares for many geriatric patients in his practice, noticed a significant change in Mr. Angle's mental status since his previous visit in May of 1996. Dr. Kent testified Mr. Angle exhibited deficits in five cognitive areas: orientation, intellect, judgment, memory and affect. After asking Mr. Angle questions to determine his abilities in those areas and generally observing him, Dr. Kent concluded he was suffering from dementia and ordered a CT scan of his head to determine its cause. After reviewing the scan in late Janu-

---

7. Canceled checks representing Libby's payments under the note were admitted as Cline exhibit no. 1. The checks were dated 2/13, 3/14, 4/12, 5/11, 6/12, 7/15, 8/6, 9/13 and 10/13 of 1997. The checks were deposited into Mr. Angle's bank accounts as reflected on bank ledgers admitted as Ronald Angle exhibit no. 1.

Libby made no payments to the estate under the note after her father died because Ronald, co-executor under the will, told her to hold off in part because he felt the litigation should be resolved first. Ronald testified Libby will not be able to repay the note in full unless the will is upheld and she receives the Hunter Road property and can take out a mortgage against it.

ary, Dr. Kent deduced Mr. Angle's dementia was not at-
tributable to a stroke but to Alzheimer's disease. Blood
tests revealed Mr. Angle was also in a late stage of pros-
tate cancer. Libby told Dr. Kent she wanted to schedule
a family meeting to discuss her father's condition. She
also expressed this desire to her siblings but the meeting
did not take place until August 22.

On February 10, 1997, Mr. Angle threw kerosene on
burning coals in his furnace and the flare-up caused irri-
tation to his throat. He could not recall the incident when
examined by Dr. Kent three days later on February 13.
Dr. Kent learned of the incident from Libby's son Ethan
who accompanied his grandfather to the doctor.

Mr. Angle and Ronald met with Attorney Steiger the
next day (February 14) to discuss the changes to his will
mentioned during his brief visit with Attorney Steiger in
October of 1996. The life estate to Martha was discussed
in detail at the meeting. Attorney Steiger and Ronald
were opposed to it for administrative reasons but Mr.
Angle was adamant on the issue. According to Attorney
Steiger and Ronald, Mr. Angle did not want to simply
give Martha the house, because she and Mr. Spielman
were still married and the property would pass to Mr.
Spielman if she predeceased him.

Attorney Steiger did not question Mr. Angle closely
about his children and did not conduct any particular tests
to evaluate his mental capacity because Mr. Angle ap-
peared to know his own mind, was very clear about how
he wanted to dispose of his assets and did not appear to
be manipulated by anyone, including Ronald, who stayed

mostly in the background while Mr. Angle did the talking.

Attorney Steiger did not know Dr. Kent had taken a CT scan of Mr. Angle and did not know about the kerosene incident. Ronald did not mention it, nor did he mention that Mr. Angle appeared to have forgotten the incident after only three days. Although Attorney Steiger testified he might have questioned his client more closely if he had known about these matters, he also testified the will changes were normal property dispositions. Attorney Steiger was generally familiar with the life circumstances of Mr. Angle's children, particularly that Martha had lived with her father at Two Top Road for many years and did not have a home of her own. Attorney Steiger saw nothing unusual in the changes, nor did he notice Mr. Angle repeating himself or acting in a confused manner.

The undisputed evidence showed Mr. Angle knew the general economic standing of all his adult children, particularly that Libby and Martha were his only children lacking homes of their own. Dean and Faye Heinbaugh own a well-established masonry contracting business and a four-bedroom stone cape cod on four acres worth approximately $200,000. They also own farmland behind the house and Dean's family owns approximately 20 acres of land improved with a house. Faye admitted their assets exceed the value of her father's total assets at the time of his death and he was aware of that fact. Mr. Angle also knew his son James, a retired electrician, owned two pieces of investment real estate and a 56-acre farm. Contestant Paul Angle works for a masonry contracting com-

pany and he and his wife Jean have owned a four-bedroom home since 1971.

Dr. Kent saw Mr. Angle at his office for a follow-up visit on February 21. He had experienced minor dizziness that morning which Dr. Kent attributed to an ear abnormality. He was not disoriented at the time of the visit, however, and had ridden his bike that morning for several miles as was his usual practice. Although Dr. Kent did not see Mr. Angle at his office or have contact with his family again until July 2, he did see him occasionally at church sometime during the spring and summer and noticed he often repeated himself during conversations.

Dean Heinbaugh testified Mr. Angle tearfully told him sometime between February and April that Libby was withholding access to her children until he changed his will. James Angle testified his father said the same thing to him sometime in the last two years of his life but could not recall the time more specifically. Both men testified they never confronted Libby about the matter because they were reluctant to interfere in Mr. Angle's affairs. By contrast, Libby, Martha, Ronald, Billy Cline and Rex Sanders denied any such withholding occurred or that any change took place in Mr. Angle's usual practice of spending most of his time at Libby's house. Billy testified her grandfather would have come to the house regardless, even if he had to walk, because he was stubborn and always had a key. Martha echoed Billy's testimony on this point.

Faye and Dean Heinbaugh testified to a discussion with Martha in March or April about Mr. Angle's will in which Martha stated she should get Two Top Road if Libby gets Hunter Road. James testified he overheard Martha

say this directly to Mr. Angle but he could not even say what year this took place. Martha denied these conversations ever occurred.

Rex Sanders testified Mr. Angle again expressed a desire to change his will several times in 1996 and 1997 to leave the house and more acreage to Libby, that he knew what he owned and what his children owned. Mr. Sanders also testified Mr. Angle was concerned for the welfare of Libby's family because "Libby ain't got nothing." Libby's bout with breast cancer in 1988 deeply upset him, in particular, because he already lost three children and his wife to cancer. When he asked Mr. Angle how his other children (now the contestants) would react to the will changes, Mr. Angle made it very clear (in colorful language) he was completely unconcerned about their potential reactions or opinions.

Mr. Angle went to Attorney Steiger's office on April 14 to execute the new will, accompanied by Ronald. Attorney Steiger testified Mr. Angle appeared to understand the changes and the will was executed in a few minutes. Attorney Steiger, who has practiced law for many years and prepares and witnesses approximately 20 wills each month, testified he found nothing unusual about the changes or Mr. Angle's conduct at the signing. He also testified he would not allow a client of his to execute a will if he suspected the client was not mentally competent to do so.

Mr. Angle occupied himself in April and May of 1997 by using his master carpentry skills to help Ronald and Mr. Sanders build a house. He was at the job site almost daily, doing light tasks such as hammering and carrying tools and materials. Ronald would not allow him on the

roof because he was less physically nimble than in prior years and Mr. Angle accepted that limitation. He continued to drive and ride his bike daily to Libby's house and to other places in April, May and early June. He also fixed himself small meals, purchased groceries and other personal items and maintained his home as he had always done. Mr. Sanders testified he never saw anyone dominate Mr. Angle, either at the job site or anywhere else, and any such efforts would have been futile because it was Mr. Angle who frequently told others what to do and how to do it.

Mr. Angle expressed a desire to buy a new car for himself in May. Ronald opposed the purchase because it seemed unnecessary but Mr. Angle went ahead with the purchase on his own. Ronald did not use his power as attorney in fact to interfere with his father's plans but deferred to him.

The undisputed evidence indicates Mr. Angle's mental condition began to deteriorate more rapidly in mid-June of 1997. He wandered into a neighbor's house over the July 4 weekend to measure their linoleum believing he had been hired to do an installation job. He frequently became confused as to dates and times, and became lost while driving in Chambersburg. In late July, police found him stopped on the roadside in the Philadelphia area in a confused state. Libby and Ronald had to pick him up. Dean Heinbaugh testified he saw Mr. Angle urinating off his front porch and that he failed to recognize Dean. He often left his car keys and signed blank checks in the car with the windows open during the summer while in Mercersburg or Chambersburg, and continued to sign blank checks despite Ronald's warnings. He repeatedly

told his family he was having an affair with a young woman and she was soon going to have his baby. Mr. Angle repeated himself several times during a July 22 visit with Dr. Kent and it was clear he was not taking his medications regularly. Dr. Kent described Mr. Angle's story about the young woman as a fixed delusion often occurring in the mild to moderate stages of Alzheimer's disease.

Mr. Angle's family met to discuss his condition on August 22. It was then his family members first learned there was a new will. Mr. Angle was admitted to Manor Care nursing home (over Martha's objections) shortly thereafter, where he died October 31.

### Dr. Kent's Opinion As to Mr. Angle's Mental Capacity

Dr. Kent's affidavit dated February 27, 1998 contains the following opinions: Mr. Angle suffered from Alzheimer's disease for several years before his death; he was mentally incompetent in April of 1997 because of the disease and could not have had instances of lucidity during that month, and he was not competent to make testamentary decisions in 1997.[8]

At trial Dr. Kent defined Alzheimer's as "a degenerative brain disease . . . of insidious onset." (Notes of deposition, p. 13.) The diagnosis is reached clinically through observation of the patient. The disease comes on slowly at first and its symptoms are subtle in the early stages. An individual in this mild stage may have short-term

---

8. Contestants' exhibit no. 2.

memory lapses such as forgetting to pay bills. Symptoms become more pronounced in the moderate stages and eventually the disease becomes so severe the individual is completely unable to care for his physical needs. The course of the disease, that is, the speed of the decline, varies from person to person.

The basis for Dr. Kent's opinion that Mr. Angle was not mentally competent in 1997 was: "Once you make the diagnosis of Alzheimer's disease, that eliminates any periods of lucidity . . . you can wax and wane day-to-day but you never come back to normal." (Notes of deposition p. 74.) Dr. Kent appeared to define "normal" in this context as the absence of a deficit in orientation, intellect, judgment, memory and affect. He conceded he was unfamiliar with the level of mental competence required for testamentary capacity. Dr. Kent also conceded he could not state with reasonable certainty Mr. Angle suffered from Alzheimer's for "several" years, but certainly its onset occurred no later than January 1997. Dr. Kent himself did not suspect Alzheimer's in May of 1996 during Mr. Angle's last appointment before the January 7 office visit.

Dr. Kent testified Mr. Angle always appeared to know who his children were. When specifically questioned about Libby, Dr. Kent stated he never observed her dominating or controlling her father. He also acknowledged he did not see Mr. Angle at his office between February 21 and July 2, and therefore, could not describe with certainty Mr. Angle's cognitive functioning on any particular day during that period.

## DISCUSSION OF THE LAW

### *Testamentary Capacity*

A probated will is presumed valid. *Estate of Pew*, 440 Pa. Super. 195, 655 A.2d 521 (1994). The testamentary capacity of the testator is presumed, absent clear and convincing evidence to the contrary. *Cohen Will*, 445 Pa. 549, 284 A.2d 754 (1971). It is the will's contestants who bear the burden of proving the testator did not know the natural objects of his bounty or the general composition of his estate. *In re Estate of Ziel*, 467 Pa. 531, 359 A.2d 728 (1976). The court must closely examine the testator's ability to conduct the ordinary business of daily life to determine whether he suffered from a severe mental incapacity.

A total lack of memory can indicate lack of testamentary capacity. *Hunter Will*, 416 Pa. 127, 205 A.2d 97 (1964). However, old age, memory lapses, the infirmities of advancing years, physical weakness or even delusions do not necessarily establish a lack of testamentary capacity. *Kerr v. O'Donovan*, 389 Pa. 614, 134 A.2d 213 (1957). The contestants must prove the testator lacked any memory or comprehension of his property holdings or the identity of immediate family members. *Kline Will*, 382 Pa. 395, 115 A.2d 364 (1955). The testator's conduct and mental status when he executed the will, or as reasonably close to that time as possible, is the relevant time to consider in determining whether he lacked testamentary capacity. *In re Estate of Ziel, supra; Masciantonio Will*, 392 Pa. 362, 141 A.2d 362 (1958).

## Undue Influence

As with an attack on testamentary capacity, a will's contestants have the burden of proving by clear and convincing evidence the testator's property dispositions were the product of undue influence. *Burns v. Kabboul,* 407 Pa. Super. 289, 595 A.2d 1153 (1991). The contestants must prove (1) the testator was of a weakened intellect when he executed his will, (2) the will's proponent stood in a confidential relationship with the testator and (3) the proponent received a substantial benefit under the will. *Id.* Once the contestants prove these three elements by clear and convincing evidence, the burden shifts to the proponents to refute the charge of undue influence. *In re Estate of Ziel, supra.*[9]

A testator can have a "weakened intellect" despite having testamentary capacity because the level of incapacity required to prove undue influence is lower than

---

9. The proponents moved for nonsuit at the close of the contestants' case in chief, at which point counsel and the court discussed at length the shifting burdens of proof and production with no consensus reached. As there is conflicting authority in the law as to which type of burden shifts to proponents once a contestant proves the three elements of undue influence, we concluded the best course of action was to deny the motion for nonsuit, hear the proponents' case and rule, based on all the relevant evidence put before us.

Our subsequent research reveals the case law merely implies both the burden of production and the burden of proof shift to the proponents once the contestants prove the three elements but does not take on this issue directly. This issue is now moot because we find neither burden shifts to the proponents in this case insofar as the contestants failed to prove two of the three elements of undue influence by clear and convincing evidence. *The Presumption of Undue Influence and the Shifting Burden of Proof,* vol. 18, 2d, Fiduciary Reporter, p. 348.

that required to prove lack of testamentary capacity. *Burns, supra.* Testamentary capacity or its absence is determined as of the time of the will's execution, or as close to that time as possible, whereas undue influence may be proven by examining a broader time period both before and after execution. *Id.* "Undue influence is generally accomplished by a gradual, progressive inculcation of a receptive mind. The 'fruits' of the undue influence may not appear until long after the weakened mental intellect has been played upon. In other words, the particular mental condition of the testatrix on the date she executed the will is not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity." *In re Estate of Clark,* 461 Pa. 52, 65, 334 A.2d 628, 634 (1975); *Estate of Lakatosh,* 441 Pa. Super. 133, 656 A.2d 1378 (1995). The contestants must prove by clear and convincing evidence the testator's intellect was weakened to the point where he and the proponent could not have dealt on equal terms. *In re Estate of Pedrick,* 505 Pa. 530, 482 A.2d 215 (1984).

The contestants also must show the existence of a "confidential relationship" between the proponent and the testator. This relationship can exist when one person has placed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust on the other. *Weir by Gasper v. Estate of Ciao,* 521 Pa. 491, 556 A.2d 819 (1989). The control must be one which "virtually destroys [the testator's] free agency . . . *In order to constitute undue influence sufficient to void a will, there*

*must be imprisonment of the body or mind* . . . fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion . . . ." *In re Estate of Ziel, supra* at 540-41, 359 A.2d at 733. (citations omitted) (emphasis in original)

The fact that a testator and proponent were parent and child does not in itself create a presumption of a confidential relationship. *In re Estate of Jakiella,* 353 Pa. Super. 581, 510 A.2d 815 (1986). Furthermore, the mere fact the proponent was a favored child of the testator also does not give rise to that presumption. *Id.* "Kindly care and solicitous attention do not amount to undue influence." *Olshefski's Estate,* 337 Pa. 420, 424, 11 A.2d 487, 489 (1940). (citations omitted) "Benevolence cannot be interpreted as undue influence unless [it] is a mask behind which hides a designing and greedy mind conspiring to deceive and exploit." *Erdeljac Will,* 388 Pa. 327, 331, 131 A.2d 97, 99 (1957).

One method of proving the existence of a confidential relationship is to show the recipient under the will held a power of attorney over the testator's assets for purposes other than the testator's mere convenience. A confidential relationship has been shown in situations where the recipient was the testator's constant companion or administered almost all the testator's personal and financial affairs during the testator's waning years. That relationship can be shown particularly where the testator was in a compromised mental or physical condition. *Estate of Kieper v. Moll,* 308 Pa. Super. 82, 454 A.2d 31 (1982). "When the relationship between persons is one of trust and confidence, the party in whom the trust and confi-

dence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage." *In the Matter of the Estate of Evasew*, 526 Pa. 98, 104, 584 A.2d 910, 913 (1990).

The contestants must also prove by clear and convincing evidence the proponents received substantial benefits under the will. The fact that a substantial benefit is granted to a beneficiary does not create a presumption the recipient exercised undue influence over the testator. *In re Estate of Ziel, supra.*

## DISCUSSION OF THE EVIDENCE
## AND FINDINGS OF FACT

### *Testamentary Capacity*

It was Dr. Kent's opinion that even a mild sufferer of Alzheimer's disease is completely incapable of making any lucid, rational decisions, although he conceded at trial he was unaware of the legal definition of testamentary capacity. He also conceded he did not see or examine Mr. Angle in the days or even weeks immediately before or after April 14, and could not state with certainty how well Mr. Angle functioned on any given day between the February 21 and July 2 office visits.

Although we accept Mr. Angle suffered from Alzheimer's disease in April of 1997, and the disease weakened his mental faculties to some extent, we cannot accept the disease rendered him completely incapable of knowing his assets and the natural objects of his bounty and precluded him from making reasonable property dis-

positions. There is no support in the law for the idea that a person in the mild or even moderate stages of Alzheimer's disease per se lacks testamentary capacity.

The February 10, 1997 kerosene-on-burning-coals incident, and Mr. Angle's inability to recall it three days later, is cited as proof he lacked testamentary capacity on April 14, 1997. Although we accept Dr. Kent's testimony that Alzheimer's disease affects an individual's short-term memory, we disagree Mr. Angle's inability to recall the incident rendered him legally incapable of making testamentary decisions on or about April 14. This is because several credible witnesses—Attorney Steiger, Libby, Ronald and Rex Sanders—testified Mr. Angle always knew what property he owned and what he wanted to do with that property. For example, the specific changes Mr. Angle discussed with Attorney Steiger on February 14, 1997 were wholly consistent with statements he made to Ronald, Mr. Spielman and Mr. Sanders as far back as 1993, and to Mr. Sanders in 1996 and 1997. The changes were also consistent with his statements to Attorney Steiger in October of 1996 when he went unaccompanied to his counsel's law office. Clearly any short-term memory lapses have no bearing on the validity of Mr. Angle's property dispositions in his new will insofar as those dispositions were the result of his long-standing intentions.

The changes Mr. Angle expressed to his attorney on February 14, 1997 were also reasonable in light of the various life circumstances of his children and his especially close relationship with Ronald and Libby. The credible evidence shows Mr. Angle gave the most property

to his neediest children (Libby and Martha) and/or the children with whom he spent the most time and for whom he had the warmest affections (Ronald and Libby). A desire to keep the mountain land in the Angle name was hardly an unusual or irrational desire.

Attorney Steiger, an experienced attorney accustomed to observing clients discuss and execute wills, credibly testified Mr. Angle never appeared confused about his children or assets in October of 1996, or on either February 14, 1997 or April 14, 1997, and appeared neither dominated nor manipulated by Ronald and never complained of being so treated by Martha or Libby.

The contestants have not proven by clear and convincing evidence their father lacked knowledge of his assets or his children, or that his property dispositions were unreasonable, and therefore, we find Mr. Angle possessed testamentary capacity on April 14, 1997.

### Undue Influence

The next issue is whether the proponents exercised undue influence over their father. In addition to determining whether the proponents received a substantial benefit under the new will, we must decide whether Mr. Angle had a weakened intellect and whether the proponents stood in a confidential relationship with their father. This requires us to examine more than Mr. Angle's mental capacity on April 14, but also his mental condition and relationship with the proponents over a broader period of time. Because we find the contestants have not proven the proponents either had or abused a confidential relationship with their father by clear and convincing

evidence, the burden never shifts to the proponents to prove the absence of undue influence, and therefore, the appeal must be dismissed.

## Substantial Benefit

Clearly each of the proponents received a substantial benefit under the new will. The house on Hunter Road with its two acres of land, the 10 acres of mountain land and a life estate in the Two Top Road house constitute a substantial portion of Mr. Angle's estate. The contestants have met their burden of proving these are a substantial benefit by clear and convincing evidence. Satisfaction of this first prong is not enough to shift the burden of disproving undue influence to the proponents, however.

## Weakened Intellect

The credible evidence shows Mr. Angle's mental powers were waning in late 1996 and 1997, specifically that he was in the mild-moderate stages of Alzheimer's between late 1996 and mid-June 1997, and a more severe stage in late June until his death in October. Even the proponents do not dispute their father's mental condition declined during this time period. The critical question, however, is whether Mr. Angle's mental faculties were so weakened that he was unable to deal with the proponents on equal terms or his mind was vulnerable to inculcation by the proponents for a prolonged period of time leading up to the will's execution on April 14, 1997, such that he lost the power to reach decisions not clouded by their influence. We find Mr. Angle's ability to reach

rational decisions about his children and his assets was never compromised by his Alzheimer's disease.

Despite his gradually declining mental powers, Mr. Angle continued to function fairly well in his daily life up through early June of 1997. He drove, rode his bike, shopped and cooked for himself, walked to Libby's house, shoveled coal and snow, hunted squirrels, helped Ronald build a house, watched Mr. Sanders' children and attended outings. Although he knew he was not as clear-headed as in the past, he continued to live life on his own terms, retaining a strong sense of personal identity and exerting his authority over others. None of his family, friends or neighbors could contradict him with any success because of his stubborn nature and strong will. He defied Ronald's advice not to purchase a new car. Ronald was also unable to convince his father to avoid the potential administrative difficulties of giving Martha a life estate instead of title to Two Top Road and Mr. Angle did not yield even to his own attorney's advice on the matter. He continued to go to Libby's house whenever he pleased.

Mr. Angle was long aware of the different life circumstances of his children. Both Libby and Martha lacked homes of their own and were still dependent on him financially. For many years he spent the most time with Ronald and Libby and felt closer to them and to their families than to his other children. Libby's household was a constant in his life since at least as early as 1993. Martha lived under the same roof with him for 18 years and clearly remained dependent on him well into adulthood. The will changes were neither abrupt nor illogical

given his relationship with the three proponents for many years before the new will was executed or even for many years before his Alzheimer's began to reveal itself more obviously in late 1996.

## Confidential Relationship

Although Mr. Angle was in the mild-moderate stages of Alzheimer's between late 1996 and early June of 1997, the credible evidence does not support the contestants' assertions that he was dominated or manipulated by anyone, including the proponents. The law requires an imprisonment of the body or mind, fraud, threats, misrepresentations, circumvention, excessive flattery such that the person's free agency is virtually destroyed. Even conceding Mr. Angle's mental faculties were on the wane does not require us to find the proponents took advantage of this decline. As discussed above, the credible evidence does not paint a picture of a man dictated to by his children. Nor does that evidence indicate anything resembling the virtual destruction of his freedom of will or movement.

Mr. Angle clearly had a closer relationship with the proponents than with his other children for many years. However, such closeness cannot by itself prove the proponents harbored impure motives or engaged in subterfuge or collusive conduct designed to exploit his affections to gain a material advantage. We could not find a shred of credible evidence to support the notion the proponents exerted any mental, emotional or physical dominance over their father, acted in an underhanded manner toward him or showered him with excessive flattery. The

most the contestants can show is the proponents, particularly Libby and Ronald, were in an excellent *position* to exercise undue influence over their father, but that is a far cry from clear and convincing proof the proponents *actually exercised* such influence. There was no credible evidence to support the claim that any of the proponents acted out of any motive other than respect, concern and sincere affection.

## Ronald Angle

The credible evidence showed Ronald and Mr. Angle enjoyed a very close relationship for many years. Ronald visited his father almost every day beginning in January 1997 because he realized his father was aging more rapidly than in the past. He learned of his father's difficulty with bank transactions and wanted to make sure his father kept his money for his own needs, and it was this concern which led him to have Libby sign the promissory note.

Ronald never tried to conceal his activities as attorney in fact, as a designing person would do, but instead took it upon himself to ask his family members if they objected to him becoming Mr. Angle's attorney in fact. In another instance of forthrightness, Ronald specifically told Attorney Steiger about James's warning not to use the power of attorney to dispose of their father's real estate.

Although the power of attorney gave Ronald access to his father's bank accounts, the credible evidence showed his main concern was to keep his father's bills and vehicle documentation up-to-date. Ronald never used

the power of attorney to his own advantage and had no desire to interfere more than necessary in his father's daily life. An example of Ronald's minimal involvement with his father's accounts is that Mr. Angle cashed a CD on his own in the spring of 1997 but Ronald only learned about it later. Mr. Angle also purchased a new car on his own in May against Ronald's advice. These facts do not support the contestants' assertions that Ronald was able to dominate his father's will, or even had the desire to manipulate or oppose his father in any way.

The contestants argue the timing of the execution of the new will which leaves the mountain land to Ronald is suspicious because it was executed only after Ronald became attorney in fact. However, family members specifically urged him to make sure the will was updated and Ronald assisted his father in the process because he felt it was part of his duties as attorney in fact. Furthermore, there is nothing unusual about a person putting off changing his will until he begins to sense his health is failing.

The credible evidence showed Mr. Angle expressed his desire to keep the mountain land in the Angle name as early as 1993. Mr. Angle did not want the land sold, which was likely to occur if it was divided up among his seven children, so he gave the land to Ronald to pass on to Ronald's sons, and rejected Ronald's offer to pay for the land. As Attorney Steiger indicated, Mr. Angle's disposition of this asset was entirely natural and reasonable.

We found Ronald to be a very credible witness, incapable of underhandedness or insincerity. His attitude was

one of respect for his father's talents and sense of independence, appreciation for his generosity and amused tolerance for his personality quirks. We sensed nothing but affection for his father and could not picture him coercing or manipulating his father in any way. The contestants have failed to prove Ronald abused his position of attorney in fact or exercised undue influence over his father.

## Libby Cline

The credible evidence showed Mr. Angle and Libby enjoyed a very close, warm relationship. She was clearly one of his favorite children since at least 1993 and he dearly loved her children. It was deep concern for her welfare and the welfare of her family which prompted him to provide her with a place to live. He was keenly aware she shouldered more financial and emotional burdens than his other children—her breast cancer, her husband's work injury, a handicapped child, unpaid bills and no home of her own. She in turn was grateful for her father's generosity and the warm affections he offered to her children.

According to the credible evidence, Mr. Angle discussed changing his will in 1993 with Ronald to give Libby the Hunter Road house and more land. Ronald credibly testified his father said in 1993 that Libby wanted to buy the Hunter Road house and additional acreage but Mr. Angle felt Libby would never be in a financial position to buy the property anyway. Mr. Angle mentioned this again to Mr. Sanders in 1996 and 1997 in the

context of acknowledging Libby shouldered more hardships than his other children.

The credible evidence showed Libby was more dependent on her father than he was on her. Her dependence made her father the more powerful figure in their relationship and undercuts the contestants' claim she exercised an overmastering influence on him. She owed him a large amount of money and lived in a house he owned and to which he retained the deed. His $30,000 loan to her family was consistent with his warm affections for her, his knowledge of her greater need and his long-standing practice of giving small amounts of money to her family over the years.

We found the contestants' evidence about Libby's withholding of her children from her father completely unpersuasive. The more credible evidence from Ronald, Libby, her daughter Billy, Martha and Rex Sanders does not bear that out. Billy maintained her mother never kept Mr. Angle from the children and could not do so even if she wanted to because he would come anyway and always had a key to the house. Even after he stopped driving, he would walk or ride his bike. Ronald and Mr. Sanders credibly testified they neither observed nor were told anything about blocked access. Even Martha, who did not always get along with Libby, testified Libby would not have been able to deny their father access to the Hunter Road home or the grandchildren.

We found Libby to be an entirely credible witness incapable of acting in an underhanded or deceitful manner toward her father. She acknowledged his health was failing in late 1996 and was prompted out of concern for

him to ask Ronald to be his attorney in fact. She specifically refused her father's request that she become attorney in fact because the $30,000 debt she owed him would create a conflict of interest. This was powerful evidence of her desire not to take advantage of her father and to avoid even the appearance of impropriety. Also, she had already begun to repay her father even before Ronald knew about the loan and before she signed the promissory note, despite her father's lack of interest in being repaid. Libby's genuine concern for her father's health prompted her to take him to Dr. Kent on January 14, 1997 and to speak with the doctor several times about the CT scan and his findings.

Contrary to the contestants' assertions that Libby manipulated her father into giving her additional property by denying access to her children, we found Libby completely devoid of ill motives toward her father. She never gave the impression she harbored any resentments against him despite being so beholden to him for so long. We perceived her simply as a caring daughter still grieving over the loss of a father who had been so generous to her in difficult times and who was a beloved presence in her home for many years. The contestants have failed to meet their burden of proving Libby had a confidential relationship with her father or exerted undue influence over him.

### Martha Spielman

The credible evidence showed Martha and her father led separate lives for the most part. They usually ate their

meals at separate times and, aside from occasional evenings spent watching television in the same room, were certainly not constant companions. There was no credible evidence Mr. Angle was emotionally or financially dependent on Martha. To the contrary, we perceived Martha as the more dependent one in the relationship. She did not own her own home but lived under her father's roof for 18 years. It was Mr. Angle who had the upper hand in their relationship as shown by the fact that he allowed Martha's estranged husband to live on the property despite the fact it greatly upset her, and he never changed his mind on the subject.

Although Mr. Angle felt Martha would be better off getting out on her own, and she herself occasionally expressed a desire to do so, he wanted her to be able to remain in the Two Top Road house if she so desired. According to the credible testimony of Ronald and Libby, Mr. Angle would have removed Martha if he really wanted her out. He did not charge Martha rent and never imposed household costs on her in an attempt to induce her to move out. We perceived Martha lacked a certain amount of self-confidence about making her own way in the world and was grateful to her father for allowing her to live at Two Top Road, despite their loud disagreements about her estranged husband's presence.

The contestants testified to having heard discussions between Martha and Mr. Angle in which she expressed feelings of entitlement to the Two Top Road house. Even if we believed those discussions took place exactly as the contestants described, which we do not, it does not

prove Martha had a confidential relationship with her father. We are also unpersuaded by the contention she exercised undue influence over her father simply because they lived under the same roof and spent some time together. The contestants have not proven Martha had a confidential relationship with her father or exercised undue influence over him.

The contestants have failed to meet their burden of showing either that Mr. Angle lacked testamentary capacity or that any of the proponents exercised undue influence over him such that the April 14, 1997 will should be voided. An appropriate decree nisi will be entered as part of this adjudication.

## DECREE NISI

Now March 21, 2000, this matter having come before the court pursuant to an appeal from probate filed by the contestants to the last will and testament of decedent Amos A. Angle, and the court having considered the evidence and arguments of counsel, hereby dismisses the appeal and confirms the last will and testament of decedent Amos A. Angle dated April 14, 1997 for the reasons set forth in the attached adjudication.

The clerk of courts is directed to notify the attorneys of record and pro se parties of the filing of this decree nisi pursuant to Pa.R.C.P. 1517 and, if no post-trial motions are filed within 10 days after such notice in accordance with Pa.R.C.P. 227.1, to enter the decree nisi as the final decree in accordance with Pa.R.C.P. 227.4.